UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
K.W., on behalf of himself and his
Infant child, K.A.,

                         Plaintiffs,                        COMPLAINT

      -against-                                DOCKET NO. 22-CV-8889

THE CITY OF NEW YORK, AMAR MOODY,
THE CHILDREN'S AID SOCIETY, and BRIAN
GOMEZ,

                                            **JURY TRIAL DEMANDED**

                        Defendants.
-----------------------------------------------------X

Plaintiffs K.W. and K.A., appearing by their attorneys, Brustein Law PLLC and Nelson, Robinson

& El Ashmawy, PLLC, complain of the defendants, the City of New York, Amar Moody, The

Children's Aid Society, and Brian Gomez (hereinafter referred to collectively as "Defendants")

as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.      This is a civil rights action in which plaintiffs K.W. and K.A. (hereinafter collectively

referred to as "Plaintiffs") seek damages to redress the deprivation, under color of state

law, of rights secured to them under the Fourth and Fourteenth Amendments to the

United States Constitution. Plaintiffs also append state law claims.

<u>JURISDICTION</u>

2.      Jurisdiction is conferred on this Court by 28 U.S.C. §1343, which provides for original

jurisdiction over all actions brought pursuant to 42 U.S.C. §1983 and 1988, and by 28

U.S.C. §1331, which provides jurisdiction over all cases brought pursuant to the

Constitution and laws of the United States. This Court also has jurisdiction over certain defendants pursuant to 28 U.S.C. §I 367. The Court has pendent jurisdiction over plaintiffs' state law claims.

3.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 (b) and (c).

## JURY DEMAND

4.    Plaintiffs demand a trial by jury in this action.

## PARTIES

5.    Plaintiff, K.W. (hereinafter referred to as "Plaintiff"), is an individual who, at all times relevant to the within action, has been a resident of the City of New York, County of the Bronx, State of New York. Plaintiff is the father and natural guardian of Plaintiff K.A. (hereinafter referred to as "Infant-Plaintiff").

6.    Infant-Plaintiff is an individual infant who, at all times relevant to the within action, has been a resident of the City of New York, Counties of New York and Bronx, State of New York.

7.    Defendant THE CITY OF NEW YORK (hereinafter referred to as "NYC"), at all times hereinafter mentioned, was and still is a municipal corporation duly organized and existing under, and by virtue of, the laws of the state of New York.

8.    NYC operates the Administration for Children Services ("ACS"), a department or agency of defendant NYC responsible for the appointment, training, supervision, promotion and discipline of case workers and supervisory case workers, including individually named defendant Amar Moody.

9.      According to its website, ACS  protects and promotes safety and well-being of New York City's children and families by providing child welfare, juvenile justice, and early care and education services.

10.     ACS provides services to the public.

11.     Upon information and belief, DEFENDANT AMAR MOODY ("Moody"), at all relevant times was employed by NYC as a Child Protective Specialist ("CPS") with ACS, an employee and agent of ACS. Defendant Moody is sued in his individual and official capacities.

12.     Upon information and belief, NYC assigned Moody to Infant-Plaintiff's case.

13.     Defendant THE CHILDREN'S AID SOCIETY ( "CAS"), at all times hereinafter mentioned, was and still is a domestic not-for-profit corporation duly constituted and existing under, and by virtue of, the laws of the State of New York and is an "authorized agency" as defined within New York Social Services Law § 371.

14.     CAS is responsible for the appointment, training, supervision, promotion and discipline of case workers and supervisory case workers, including individually named defendant Brian Gomez.

15.     Upon information and belief, Defendant BRIAN GOMEZ ("GOMEZ"), at all times relevant herein, was a Case Planner for CAS, an employee and agent of CAS. Defendant Gomez is sued in his individual and official capacities.

16.     Upon information and belief, CAS assigned Defendant Gomez to Infant-Plaintiff's case.

17.     That a Notice of Plaintiff's Claim, including the nature of the claim, the date, time, and location thereof, and the manner in which the claim arose, was duly served upon the New York City Comptroller's Office, on or about August 12, 2022.

18.    That more than 30 days have elapsed since the first Notice of Claim has been served upon
Defendant NYC and said Defendant has neglected or refused to make any adjustment or
payment thereof.

## FACTS

19.    ACS is authorized by New York State law to provide and/or coordinate care for children in
foster care.  These children in foster care are in the legal custody of the Commissioner of
ACS.

20.    On or about March 2, 2017, the Infant-Plaintiff was born at Bronx Lebanon Hospital in
Bronx County, the City of New York.  This is the Plaintiff's first, and only, child.

21.    On or about March 2, 2017, the Plaintiff executed an acknowledgement of paternity as
to the Infant-Plaintiff. The Infant-Plaintiff was released to his custody upon discharge
from the hospital.

22.    On or about March 7, 2017, Defendant Moody and another CPS employed by ACS
appeared at the residence of the Plaintiff and stated they were contacted to do a welfare
check on the Infant-Plaintiff.

23.    Plaintiff complied with the request, permitted Defendant Moody and the other CPS into
his apartment, showed them around and allowed them to examine the Infant-Plaintiff.

24.    Neither Defendant Moody nor the other CPS raised any child protective concerns with
Plaintiff and left Plaintiff's home without removing Infant-Plaintiff.

25.    As of March 7, 2017, Defendants NYC and Moody did not have any safety concerns
which required them to remove Infant-Plaintiff from Plaintiff's home as they allowed

Infant-Plaintiff to remain alone overnight with his father, Plaintiff.

26.   Before leaving, Defendant Moody and the other CPS stated that he, the Infant-Plaintiff,

and the Infant-Plaintiff's mother had to attend a conference held at ACS's offices the

next day. Both CPS then left the home.

27.   On, or about, March 8, 2017, the Plaintiff voluntarily arrived at, and brought Infant-

Plaintiff to ACS' office as directed.

28.   Upon entry into the meeting, Defendant Moody and another ACS employee informed

Plaintiff that the Infant-Plaintiff should be left with ACS staff while the meeting was

conducted.

29.   Neither Defendant Moody nor any other agent of ACS informed the Plaintiff that the

Infant-Plaintiff would be removed from his care and custody and not returned after the

meeting.

30.   Plaintiff complied with the request and entered the meeting.  Once away from the Infant-

Plaintiff, in a closed room, agents of the Defendant NYC informed the Plaintiff as to the

purpose of the meeting and that the Infant-Plaintiff was being removed from the

Plaintiff—based on allegations solely against the Infant-Plaintiff's mother.

31.   Plaintiff fell to his knees crying and screaming.

32.   Agents of NYC advised Plaintiff that he would be a "Non-Respondent"—accused of no

wrongdoing or child protective concern.

33.   They told Plaintiff that even though he was not being accused of any wrongdoing,  he

would have to attend Court that same day and request the Infant-Plaintiff's return to his

care and custody through a Family Court Judge presiding over a Family Court Child

Protective proceeding.

34.     On or about March 8, 2017, the referenced Child Protective action, pursuant to Article Ten

of the Family Court Act, solely charging the Infant-Plaintiff's mother with neglect was

filed by petition before the New York County Family Court pursuant to Docket Number

NN-05760-17.

35.      The petition was arraigned before the Honorable Jane Pearl on that date.

36.     According to Family Court records, the Infant-Plaintiff was remanded to the temporary

care and custody of ACS despite Plaintiff being a Non-Respondent, having not been

accused of any wrong-doing, and having formally acknowledged paternity in the hospital

upon Infant-Plaintiff's birth.

37.     The removal and remand of the subject child continued unlawfully from March 8, 2017

through November 13, 2019, when the child was "trial discharged" to Plaintiff. The Infant-

Plaintiff was placed in a stranger ("non kinship") foster home operated by the Children's

Aid Society for the next two years, eight months and seven days.

38.     Plaintiff clearly and repeatedly articulated his objection to the removal of his son, the

Infant-Plaintiff, from his care, his desperation to have him returned to his care, and his

willingness to follow any and all court orders and conditions to have his son, Infant-

Plaintiff returned to his care.

39.     On or about April 6, 2017, the New York County Family Court entered an order continuing

Infant-Plaintiff's temporary placement in the custody ACS until the completion of the next

permanency hearing or pending further orders of this court.  On the same date, Plaintiff

was instructed to file for paternity and did so before the Bronx County Family Court,

pursuant to Docket Number P-0597-17. Unfortunately, the Petition was deemed to be filed in the wrong county and was dismissed without prejudice.

40.    On or about April 19, 2017, ACS filed a motion seeking reasonable efforts to reunite the Infant-Plaintiff with his parents be excused pursuant to Section 1039(b) of the Family Court Act—despite Plaintiff being a Non-Respondent and having expressed clearly his desire to have his son returned immediately to his care.

41.    Despite Plaintiff having no child protective history and being a Non-Respondent, he was provided a "service plan" by CAS and was instructed that he had to comply with the recommended services and visit only supervised while at CAS offices for short periods of time.

42.    In or around April 2017, Plaintiff completed the parenting classes he was referred to by CAS.

43.    On or about May 26, 2017, Plaintiff filed a new paternity petition before the New York County Family Court.

44.    On or about August 1, 2017, the Court continued the placement of Infant-Plaintiff in the custody of ACS until the completion of the next permanency hearing or pending further orders of this court.

45.    On or about August 17, 2017, Plaintiff was adjudicated the legal father of Infant-Plaintiff and an Order of Filiation was entered. Despite the Order confirming Plaintiff as the legal father to Infant-Plaintiff, in addition to having no child protective concerns whatsoever, Infant-Plaintiff was not returned to his father.

46.   In or around November 17, 2017, ACS recommended for the Infant-Plaintiff to continue in foster care placement until the birth parents had fully completed ACS's service plan for them

47.   Despite no abuse or neglect allegations against Plaintiff, ACS demanded that Plaintiff first complete a first aid/CPR class, a mental health evaluation, enroll into individual therapy if necessary, and undergo random drug screenings as requested by the agency before they would consent to son being returned to his care.

48.   According to the agency, Plaintiff had already submitted to drug screenings as requested and had been testing negative, completed a mental health intake appointment at the Nathaniel Clinic and had scheduled an appointment to have a psychiatric evaluation completed. The agency noted that Plaintiff attended each of the agency visitations with the Infant-Plaintiff and observed positive bonding between the father and the child as Plaintiff always greeted his son with a smile, demonstrated affection and the child appeared excited and joyful when Plaintiff entered the room.

49.   Despite no legitimate concerns or legal basis to oppose returning his son to his care, Defendants continued to object to Plaintiff being reunited with his son.

50.   On or about December 19, 2017, ACS submitted a permanency hearing report detailing that Plaintiff had completed all service plan directives. Nonetheless, the removal of Infant-Plaintiff from Plaintiff was continued.

51.   The permanency hearing report was sworn to by Defendant Gomez.

52.   Even though Defendant Gomez' report referred to Plaintiff as the birth father, it still claimed Plaintiff was the "Alleged Father" and not legally responsible for his son, Infant Plaintiff.

53.    Even though Plaintiff had complied with all of ACS' demands and was a non-respondent, Defendants refused to return Infant-Plaintiff to his care.

54.    Upon information and belief, had Plaintiff been a white female, instead of a black male, Defendants would not have taken Infant-Plaintiff away from him and refused to return Infant-Plaintiff to his care.

55.    Upon information and belief, Plaintiff was treated less well by the Defendants because of his race.

56.    Upon information and belief, Plaintiff was treated less well because of his gender.

57.    On or about April 4, 2018, ACS submitted a permanency hearing report recommending Infant-Plaintiff to remain in the current foster care placement until the birth parents have completed their service plans (despite Plaintiff having done so many months previously).

58.    The agency noted that Plaintiff had completed a psychiatric evaluation on in November 2017 and has not needed any further therapeutic referrals since. The report also noted that Plaintiff attended each of the agency visitations with his son, observing positive bonding between the father and the child.

59.    On or about May 21, 2018, the Family Court entered an Order directing Infant-Plaintiff to continue to be placed in the custody of the Commissioner of Social Services until the completion of the next permanency hearing or pending further orders of this court. The Order permitted Plaintiff to Agency supervised visits with the discretion to expand visitation.

60.    On or about August 13, 2018, Plaintiff filed a petition before the New York County Family Court seeking full custody of his son.

61.   On or about August 31, 2018, ACS submitted a report to the Family Court stating the parents still needed to complete the services recommended in their service plan. The report noted that Plaintiff was engaged in *voluntary* drug treatment at Odyssey House and continued to test negative for marijuana and all illegal substances.

62.   On or about December 18, 2018, the Family Court entered an Order that Infant-Plaintiff shall continue to be placed in the custody of the Commissioner of Social Services until the completion of the next permanency hearing or pending further orders of this court and that the parents' visitation with Infant-Plaintiff may be expanded at the Agency's discretion.

63.   On or about March 28, 2019, Plaintiff completed all additional services beyond what the service plan he had previously satisfied nearly eighteen months previously.

64.   On or about April 29, 2019, the Family Court entered an Order continuing placement of Infant-Plaintiff to be placed in the custody of the Commissioner of Social Services until the completion of the next permanency hearing or pending further orders of this court. The Court further ordered that unsupervised visiting time was to be put in place between the child and both parents, conditioned on compliance with the visiting coaching, random screens, and OPWDD services and mental services.

65.   In or around May 2019, Plaintiff was diagnosed with dysthymic disorder and was recommended to continue psychotherapy to help support his emotional state from being isolated from his son, Infant-Plaintiff.

66.   In or around June 18, 2019, Plaintiff's psychotherapist wrote a letter supporting his application to regain custody of child.

67.   For more than 2 years, Plaintiff was prevented by Defendants' actions from having any unsupervised time with his son, Infant-Plaintiff.

68.    Defendants' actions prevented Plaintiff from witnessing Infant-Plaintiff's first step, first word, and many other important milestones.

69.    On or about June 19, 2019, the Family Court entered an Order directing ACS to progressively expand to unsupervised day visits between Plaintiff and Infant-Plaintiff.

70.    On or about June 23, 2019, June 25, 2019, July 2, 2019, and July 3, 2019, Plaintiff had 3-hour visits with Infant-Plaintiff. On or about July 9, 2019and July 11, 2019, Plaintiff had 3.5-hour visits with Infant Plaintiff. On or about July 16, 2019 and July 19, 2019, Plaintiff had 4-hour visits with Infant Plaintiff. On or about July 19, 2019, Plaintiff had a 7-hour visit with Infant Plaintiff. On or about July 25, 2019, Plaintiff had his first overnight visit with Infant-Plaintiff.

71.    On or about August 7, 2019, the Family Court entered an Order directing visits be continued between Plaintiff and Infant-Plaintiff.

72.    On or about September 20, 2019, ACS submitted a Permanency Hearing Report stating Plaintiff would like to plan for his son (a position he had unambiguously articulated for the previous two and one half years). The report continued that concerns regarding his parenting had been addressed.

73.    On or about October 16, 2019, the Family Court entered an Order continuing to place the Infant-Plaintiff in the custody of the Commissioner of Social Services until the completion of the next permanency hearing or pending further orders of this court. Notably, the Order set a new permanency goal for Plaintiff to have custody of the Infant-Plaintiff.

74.    On or about October 23, 2019, the Family Court entered an Order stating that a conference was to be held within two (2) weeks as to modifying the Permanency Hearing Order to release Infant-Plaintiff to Plaintiff with supervision.

75.  On or about December 16, 2019, Infant-Plaintiff was released to the custody of Plaintiff with six (6) months ACS Supervision.

76.  On or about August 14, 2020, Plaintiff was granted sole legal and physical custody of the Infant-Plaintiff.

## FIRST CLAIM
### (Interference with Right to Intimate Association Against all Defendants)

77.  Plaintiffs re-allege and incorporate herein by reference each and every allegation contained in each preceding paragraph with the same force and effect as though each were fully set forth herein.

78.  As the Father and natural guardian of Infant-Plaintiff, Plaintiff is afforded the constitutional right to intimate association with his son.

79.  The right to intimate association guarantees an individual an intimate relationship including, but not limited to, the raising of one's child free from undue intrusion by the State or any other individual or entity acting under color of law.

80.  Defendants violated Plaintiffs' First Amendment right to intimate association by preventing Infant-Plaintiff from the care and custody of Plaintiff, advocating for and/or ensuring restriction of Plaintiff's parental access to Infant-Plaintiff, and advocating for and/or ensuring the restriction of residency of Infant-Plaintiff.

81.  Defendants infringed upon Plaintiffs' First Amendment right to intimate association by advocating for and/or ensuring Infant-Plaintiff be removed from the care and custody of Plaintiff despite an Order declaring Plaintiff the legal father to Infant-Plaintiff and no child protective concerns whatsoever.

82.  Defendants had no exception nor reasonable basis to interfere with Plaintiffs' right to intimate association with each other.

83.     Defendants acted under color of law.

84.     As a direct and proximate result of the misconduct and abuse of authority stated above,
        Plaintiffs sustained the damages alleged herein.

## SECOND CLAIM
### (Malicious Prosecution Against Defendants Moody and Gomez)

85.     Plaintiff repeats and re-alleges each and every allegation set forth above as if reasserted
        and re-alleged herein.

86.     By their conduct, as described herein, and acting under color of state law, Defendants are
        liable to Plaintiff under 42 U.S.C. § 1983 for violation of Infant-Plaintiff's constitutional
        right to be free from malicious prosecution under the Fourth and Fourteenth Amendments
        to the United States Constitution.

87.     Defendant unlawful actions were done willfully, knowingly, with malice and with the
        specific intent to deprive Infant-Plaintiff of his constitutional rights.  The prosecution by
        Defendants of Infant-Plaintiff constituted malicious prosecution in that there was no
        remove Infant-Plaintiff from Plaintiff's care, yet Defendants continued with the removal,
        which was resolved in Plaintiffs' favor on August 14, 2020.

88.     Defendants Moody and Gomez acted under color of law.

89.     As a direct and proximate result of the misconduct and abuse of authority stated above,
        Infant-Plaintiff sustained the damages alleged herein.

## THIRD CLAIM
### (Negligence against all Defendants)

90.     Plaintiffs re-allege and incorporate herein by this reference each and every allegation
        contained in each preceding paragraph above as though fully set forth herein.

91.    It was the duty of Defendants to use reasonable care in the investigation, licensing, supervision, and/or monitoring of foster care facilities with whom they placed foster children and/or to develop or implement programs, guidelines, procedures, and/or training to provide appropriate care to foster children.

92.    That by reason of Infant-Plaintiff's foster care placement, Defendants assumed a legal duty to provide for the health, safety, and/or general welfare of Infant-Plaintiff. That by reason of that circumstance a special duty of care was created between Defendants and Plaintiffs to determine Infant-Plaintiff's eligibility for services, authorize the services to be provided to Infant-Plaintiff, assess the quality and appropriateness of services provided to Infant-Plaintiff, refer Infant-Plaintiff and Plaintiff to service providers, delineate the roles of service providers, document progress and adherence to the service plan in the case record that such services are provided, arrange for the provision of services to meet identified medical, behavioral, or educational needs of Infant-Plaintiff, and/or inform and work with Plaintiff with the goal of making it possible for Infant-Plaintiff to be returned home safely.

93.    It was the duty of Defendants to use reasonable care in the execution of their duties as and/or to act in a reasonably prudent manner to provide Infant-Plaintiff with an appropriate home.

94.    Defendants their agents, servants, and/or employees, disregarded their duty to protect and provide for Infant-Plaintiff through the negligent supervision; failing to adequately train the facility's employees to act as a reasonably prudent foster care facility employee; and/or ensure Infant-Plaintiff to be returned home safely in a timely manner.

95.   Defendants knew or should have known of the dangerous conditions the Infant-Plaintiff was in while in the care of Defendants absent the provision of adequate and timely mental health services.

96.   That Infant-Plaintiff was caused to sustain serious personal injuries as a result of the negligence of the Defendants by and/or through their agents, servants, and/or their employees, including but not limited to, the development and/or exacerbation of the symptoms and severity of the Infant-Plaintiff's mental health conditions.

97.   Defendants, their agents, servants, and/or employees, negligently and/or carelessly failed to take all reasonable and necessary precautions to prevent the aforesaid occurrence(s).

98.   Defendants negligently, carelessly, and/or recklessly acted in that they failed to use the appropriate care in the performance of their official duties as a foster care agency and/or provider as a reasonably prudent and careful foster care agency and/or provider would have used under similar circumstances, in that they failed to release Infant-Plaintiff to his Father despite his status as Infant-Plaintiff's legal father and lack of child safety concerns.

99.   As a result of the negligence of Defendants, Infant-Plaintiff suffered extensive, severe, and serious psychological damage, extreme pain and suffering, emotional shock and mental anguish, the need for further medical care and treatment, a decrease in his enjoyment of life, and lost earning capacity, all without negligence on his part contributing thereto.

100.  The foregoing injuries and damages to Infant-Plaintiff were actually and proximately caused by virtue of the carelessness and/or negligence on the part of Defendants, their servants, agents, and/or employees, and without any negligence on the part of Infant-Plaintiff contributing thereto.

101.    This action falls within one or more of the exceptions set forth in CPLR § 1602 and, as such, Defendants are jointly and severally liable pursuant to the exceptions set forth in Article 16 of the CPLR in that Defendants' liability arises by reason of a non-delegable duty, respondeat superior, action(s) with reckless disregard for the safety of others, and/or action(s) performed knowingly or intentionally and in concert.

102.    As a direct and proximate result of the negligence stated above, Plaintiffs sustained the damages alleged herein.

## FOURTH CLAIM
### (State malicious prosecution claim against all Defendants)

103.    Plaintiffs re-allege and incorporate herein by reference each and every allegation contained in each preceding paragraph with the same force and effect as though each were fully set forth herein.

104.    On or about March 8, 2017, ACS filed a neglect petition against Infant-Plaintiff's mother pursuant to Article Ten of the Family Court Act.

105.    According to Court records, the Infant-Plaintiff was remanded to the temporary care and custody of the New York City Commissioner of Children's Services despite Plaintiff being a Non-Respondent, having been accused of no wrong-doing, and having acknowledged paternity in the hospital upon Infant-Plaintiff's birth.  This removal and remand of the subject child continued unlawfully from March 8, 2017 through November 13, 2019, when the child was "trial discharged" to Plaintiff. The Infant-Plaintiff was placed in a stranger foster home operated by the Children's Aid Society for the next two years, eight months and seven days.

106.   The removal of the Infant-Plaintiff from the care and custody of Plaintiff was done without without justifiable grounds and probable cause as at the time the petition was made as ACS knew that Plaintiff was the child's father and had no child safety concerns.

107.   Upon information and belief, said proceeding was initiated out of actual malice without any ends of justice being served. Rather, ACS acted with actual malice removing InfantPlaintiff neglect proceeding which was ultimately dismissed in full favor of Plaintiff.

108.   On or about December 16, 2019, Infant-Plaintiff was released to the custody of Plaintiff with six (6) months ACS Supervision On or about August 14, 2020, Plaintiff was granted sole legal and physical custody of the Infant-Plaintiff.

109.   Upon information and belief, Defendant NYC and/or ACS have a custom or widespread practice of maliciously prosecuting individuals despite the lack of probable cause.

110.   Upon information and belief, Defendant NYC and/or ACS exhibited a pervasive custom or practice indicative of a deliberate indifference to its citizens' civil or constitutional rights.

111.   That, as a result of the above-described policy, custom, or practice, Plaintiff was maliciously prosecuted by Defendant NYC and/or ACS despite the fact that he had committed no violation.

112.   By reason of the foregoing, Defendant NYC violated Plaintiff's statutory, common law, and constitutional rights resulting in the involuntary removal of Infant-Plaintiff from the care and custody of Plaintiff, the separation of Infant-Plaintiff from his younger siblings, and exacerbation of the mental health concerns of Infant-Plaintiff.

**FIFTH CLAIM**
**(Gender Discrimination in Violation of the New York City Human Rights Law)**

113.    Plaintiffs repeat, reallege and incorporate each and every allegation contained in the paragraphs above as more fully set forth herein.

114.    The acts which constitute and form this cause of action were perpetrated upon Plaintiff while he was being provided services by ACS and while he was protected under the New York City Human Rights Law ("NYCHRL") because of his gender.

115.    Plaintiff at all relevant times herein, was a member of a protected class under the NYCHRL because he is and was a male.

116.    ACS provides services to the public.

117.    Defendant NYC is subject to the NYCHRL because it provides services as a public accommodation.

118.    Defendants Moody, Gomez, and CAS were all contracted by NYC to assist in providing public accommodations.

119.    Defendants Moody, Gomez, and CAS were all agents of NYC.

120.    Defendants all acted under color of law.

121.    Defendants had notice of Plaintiff's gender.

122.    Defendants regularly permit mothers  to retain custody of their children when they are non-respondents.

123.    Defendants often permit mothers who are respondents to retain custody of their children.

124.    Plaintiff was treated less well than mothers are treated by Defendants when they removed Infant-Plaintiff from his custody, limited his visitation to only a few hours per week and kept him from the care and custody his son for years without justification.

125.    The facts alleged herein constitute unlawful discrimination against Plaintiff by Defendants, based on Plaintiff's gender, in violation of Chapter 1, Title 8 of the Administrative Code of the

City of New York, §8-107(4)(a)("the New York City Human Rights Law"), which, *inter alia*, states that:

> It shall be unlawful discriminatory practice for any person who is…
> an agent or employee or agent of any place or provider of public
> accommodation, because of any person's actual or perceived race,
> creed, color, national origin, age, gender… directly or indirectly to
> refuse, withhold from or deny to such person the full and equal en-
> joyment, on equal terms and conditions, of any of the accommoda-
> tions , advantages, services, facilities or privileges of the place or
> provider of public accommodation."

126.    As a direct and proximate result of Defendants' violation of the NYCHRL Defendants are liable to Plaintiff pursuant to §8-502(a) of said statute for "damages including punitive damages," and pursuant to §8-502(f) of said statute for "costs and reasonable attorney's fees," based on the lodestar method, as has been judicially established and accepted as a means of calculating attorney's fees, when they are properly available under the law, or as they are here, and for pre-judgment interest.

127.    In addition to being adversely affected in his enjoyment of his son and suffering a significant loss of parent-child bonding, Plaintiff has been humiliated, demeaned and degraded, all of which has been caused by Defendants' unlawful conduct due to discrimination based on Plaintiff's gender, in violation of Plaintiff's human rights.

128.    As a direct and proximate result of Defendants' conduct complained of herein, Plaintiff has suffered damages, injuries and losses, both actual and prospective, which include damage to his relationship with his son, psychological damage, and the emotional pain and suffering Plaintiff has been caused to suffer, and the impact upon the quality of life and her well-being.

129.    The acts of Defendants were egregious and committed with reckless indifference in the face of a perceived risk that its actions would violate Plaintiff's protected rights under the NY-CHRL, so that, in addition to damages inflicted upon Plaintiff and in addition to all the other measures of relief to which Plaintiff may be properly entitled herein, Defendants should also be required to pay punitive damages for their discriminatory conduct in order to deter Defendants and others similarly situated from engaging in such conduct in the future.

### SIXTH CLAIM
### (Race Discrimination in Violation of the New York City Human Rights Law)

130.    Plaintiffs repeat, reallege and incorporate each and every allegation contained in the paragraphs above as more fully set forth herein.

131.    The acts which constitute and form this cause of action were perpetrated upon Plaintiff while he was being provided services by ACS and while he was protected under the New York City Human Rights Law ("NYCHRL") because of his race.

132.    Plaintiff at all relevant times herein, was a member of a protected class under the NYCHRL because he is and was African American.

133.    ACS provides services to the public.

134.    Defendant NYC is subject to the NYCHRL because it provides services as a public accommodation.

135.    Defendants Moody, Gomez, and CAS were all contracted by NYC to assist in providing public accommodations.

136.    Defendants Moody, Gomez, and CAS were all agents of NYC.

137.    Defendants all acted under color of law.

138.    Defendants had notice of Plaintiff's race.

139.    Defendants regularly permit Caucasians to retain custody of their children when they are non-respondents.

140.    Defendants often permit Caucasians who are respondents to retain custody of their children.

141.    Plaintiff was treated less well than Caucasians are treated by Defendants when they removed Infant-Plaintiff from his custody, limited his visitation to only a few hours per week and kept him from the care and custody his son for years without justification.

142.    The facts alleged herein constitute unlawful discrimination against Plaintiff by Defendants, based on Plaintiff's race, in violation of Chapter 1, Title 8 of the Administrative Code of the City of New York, §8-107(4)(a)("the New York City Human Rights Law"), which, *inter alia*, states that:

> It shall be unlawful discriminatory practice for any person who is…
> an agent or employee or agent of any place or provider of public
> accommodation, because of any person's actual or perceived race,
> creed, color, national origin, age, gender… directly or indirectly to
> refuse, withhold from or deny to such person the full and equal en-
> joyment, on equal terms and conditions, of any of the accommoda-
> tions , advantages, services, facilities or privileges of the place or
> provider of public accommodation."

143.    As a direct and proximate result of Defendants' violation of the NYCHRL Defendants are liable to Plaintiff pursuant to §8-502(a) of said statute for "damages including punitive damages," and pursuant to §8-502(f) of said statute for "costs and reasonable attorney's fees," based on the lodestar method, as has been judicially established and accepted as a means of calculating attorney's fees, when they are properly available under the law, or as they are here, and for pre-judgment interest.

144.    In addition to being adversely affected in his enjoyment of his son and suffering a signifi-

cant loss of parent-child bonding, Plaintiff has been humiliated, demeaned and degraded, all of

which has been caused by Defendants' unlawful conduct due to discrimination based on Plaintiff's

race, in violation of Plaintiff's human rights.

145.    As a direct and proximate result of Defendants' conduct complained of herein, Plaintiff has

suffered damages, injuries and losses, both actual and prospective, which include damage to his

relationship with his son, psychological damage, and the emotional pain and suffering Plaintiff has

been caused to suffer, and the impact upon the quality of life and her well-being.

146.    The acts of Defendants were egregious and committed with reckless indifference in the

face of a perceived risk that its actions would violate Plaintiff's protected rights under the NY-

CHRL, so that, in addition to damages inflicted upon Plaintiff and in addition to all the other

measures of relief to which Plaintiff may be properly entitled herein, Defendants should also be

required to pay punitive damages for their discriminatory conduct in order to deter Defendants and

others similarly situated from engaging in such conduct in the future.


**<u>PRAYER FOR RELIEF</u>**


WHEREFORE, Plaintiffs respectfully request that judgment be entered:

a.  Awarding Plaintiffs full and fair compensatory damages in an amount to be
    determined by the jury;
b.  Awarding Plaintiffs full and fair punitive damages in an amount to be determined by
    the jury;
c.  Awarding Plaintiffs costs;
d.  Awarding Plaintiffs reasonable attorneys' fees pursuant to 42 U.S.C. §1988; and,
e.  Granting such other relief as this Court may deem just and proper.

DATED:      October 18 2022
            New York, New York

BRUSTEIN LAW, PLLC


By:      _____/s/ *Evan Brustein*_____
         Evan Brustein, Esq.
         Attorneys for Plaintiff
         299 Broadway, 17th Floor
         New York, New York 10007
         Tel:  (212) 233-3900
         Fax: (212) 285-0531