UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
K.W., on behalf of himself and his
Infant child, K.A.,

|  |  |
|---|---|
| Plaintiffs, | **FIRST AMENDED COMPLAINT** |
| -against- | DOCKET NO. 22-CV-8889 |

THE CITY OF NEW YORK, AMAR MOODY,
THE CHILDREN'S AID SOCIETY, and BRIAN
GOMEZ,

**JURY TRIAL DEMANDED**

Defendants.
-----------------------------------------------------X

Plaintiffs K.W. and K.A., appearing by their attorneys, Brustein Law PLLC and Nelson, Robinson & El Ashmawy, PLLC, complain of the Defendants, the City of New York, Amar Moody, The Children's Aid Society, and Brian Gomez (hereinafter referred to collectively as "Defendants") as follows:

## PRELIMINARY STATEMENT

1.      This is a civil rights action in which plaintiffs K.W. and K.A. (hereinafter collectively referred to as "Plaintiffs") seek damages to redress the deprivation, under color of state law, of rights secured to them under the Fourth and Fourteenth Amendments to the United States Constitution. Plaintiffs also append state law claims.

## JURISDICTION

2.      Jurisdiction is conferred on this Court by 28 U.S.C. §1343, which provides for original jurisdiction over all actions brought pursuant to 42 U.S.C. §1983 and 1988, and by 28 U.S.C.

§1331, which provides jurisdiction over all cases brought pursuant to the Constitution and laws of the United States. This Court also has jurisdiction over certain defendants pursuant to 28 U.S.C. §I 367. The Court has pendent jurisdiction over Plaintiffs' state law claims.

3.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 (b) and (c).

## JURY DEMAND

4.      Plaintiffs demand a trial by jury in this action.

## PARTIES

5.      Plaintiff, K.W. (hereinafter referred to as "Plaintiff"), is an Africam American and Black male who, at all times relevant to the within action, has been a resident of the City of New York, County of the Bronx, State of New York. Plaintiff is the father and natural guardian of Plaintiff K.A. (hereinafter referred to as "Infant-Plaintiff").

6.      K.A., Infant-Plaintiff is an African Ameriacn and Black infant who, at all times relevant to the within action, has been a resident of the City of New York, Counties of New York and Bronx, State of New York.

7.      Defendant THE CITY OF NEW YORK (hereinafter referred to as "NYC"), at all times hereinafter mentioned, was and still is a municipal corporation duly organized and existing under, and by virtue of, the laws of the state of New York.

8.      NYC operates the Administration for Children Services ("ACS"), a department or agency of Defendant NYC responsible for the appointment, training, supervision, promotion and discipline of case workers and supervisory case workers, including individually named Defendant, Amar Moody.

9. According to its website, ACS protects and promotes safety and well-being of New York City's children and families by providing child welfare, juvenile justice, and early care and education services.

10. ACS provides services to the public.

11. ACS was to provide services to K.W. and K.A.

12. Upon information and belief, DEFENDANT AMAR MOODY ("Moody"), at all relevant times was employed by NYC as a Child Protective Specialist ("CPS") with ACS, an employee and agent of ACS. Defendant Moody is sued in his individual and official capacities.

13. Upon information and belief, NYC assigned Moody to Infant-Plaintiff's case.

14. Defendant THE CHILDREN'S AID SOCIETY ("CAS"), at all times hereinafter mentioned, was and still is a domestic not-for-profit corporation duly constituted and existing under, and by virtue of, the laws of the State of New York and is an "authorized agency" as defined within New York Social Services Law § 371.

15. CAS is responsible for the appointment, training, supervision, promotion and discipline of case workers and supervisory case workers, including individually named defendant Brian Gomez.

16. Upon information and belief, Defendant BRIAN GOMEZ ("GOMEZ"), at all times relevant herein, was a Case Planner for CAS, an employee and agent of CAS. Defendant Gomez is sued in his individual and official capacities.

17. Upon information and belief, CAS assigned Defendant Gomez to Infant-Plaintiff's case.

18. That a Notice of Plaintiff's Claim, including the nature of the claim, the date, time, and location thereof, and the manner in which the claim arose, was duly served upon the New York City Comptroller's Office, on or about August 12, 2022.

19.     That more than 30 days have elapsed since the first Notice of Claim has been served upon Defendant NYC and said Defendant has neglected or refused to make any adjustment or payment thereof.

## FACTS

20.     ACS is authorized by New York State law to provide and/or coordinate care for children in foster care.  These children in foster care are in the legal custody of the Commissioner of ACS.

21.     On or about March 2, 2017, the Infant-Plaintiff was born at Bronx Lebanon Hospital in Bronx County, the City of New York.  This is the Plaintiff's first, and only child.

22.     On or about March 2, 2017, at the hospital where K.A. was born, the Plaintiff executed an acknowledgement of paternity as to the Infant-Plaintiff. The Infant-Plaintiff was released to his custody upon discharge from the hospital.

23.     On or about March 7, 2017, Defendant Moody and another CPS employed by ACS appeared at the residence of the Plaintiff and stated they were contacted to do a welfare check on the Infant-Plaintiff.

24.     Even though no reason was given for the welfare check, Plaintiff complied with the request, permitted Defendant Moody and the other CPS into his apartment, showed them around and allowed them to see and examine the Infant-Plaintiff.

25.     No reason was given to K.W. for the visit from Defendants.

26.     Neither Defendant Moody nor the other CPS raised any child protective concerns with Plaintiff and left Plaintiff's home without removing Infant-Plaintiff on that date.

27.     As of March 7, 2017, Defendants NYC and Moody did not have any safety concerns

which required them to remove Infant-Plaintiff from Plaintiff's home as they allowed Infant-Plaintiff to remain alone overnight with his father, Plaintiff.

28.  Before leaving, Defendant Moody and the other CPS stated that he, the Infant-Plaintiff, and the Infant-Plaintiff's mother had to attend a conference held at ACS's offices the next day. Both CPS then left the home.  No reason was provided to Plaintiff as to why he was directed to attend a conference as ACS.

29.  On the following day, or about, March 8, 2017, the Plaintiff voluntarily arrived at, and brought Infant-Plaintiff to ACS' office as directed.

30.  Upon entry into the meeting, Defendant Moody and another ACS employee informed Plaintiff that the Infant-Plaintiff should be left with ACS staff while the meeting was conducted.  As per these directives, Plaintiff gave Infant-Plaintiff to an ACS staff member to watch while he was at the meeting.

31.  Neither Defendant Moody nor any other agent of ACS informed the Plaintiff that the Infant-Plaintiff would be removed from his care and custody and not returned after the meeting.

32.  Plaintiff complied with the request and entered the meeting.  Only once away from the Infant-Plaintiff, in a closed room, agents of the Defendant NYC and Defendants informed the Plaintiff as to the purpose of the meeting and that the Infant-Plaintiff was being removed from the Plaintiff, not because of anything that K.W. had done, not because he had been suspected of child neglect or abuse — but based on allegations solely against the Infant-Plaintiff's mother.

33.  Plaintiff fell to his knees crying and screaming.

34.    Defendants took the Infant-Plaintiff from the Plaintiff without any due process.

35.    Defendants took the Infant-Plaintiff from the Plaintiff without any emergency.

36.    Agents of NYC took the Infant-Plaintiff from the Plaintiff without any hearing.

37.    Defendants took the Infant-Plaintiff although Plaintiff objected to this conduct of Defendants.

38.    Agents of NYC took the Infant-Plaintiff from the Plaintiff without any warning up until the time the Infant-Plaintiff was physically taken from Plaintiff.

39.    Agents of NYC took the Infant-Plaintiff from the Plaintiff without seeking any court approval, but rather making Plaintiff seek Court approval for the Infant-Plaintiff to be returned to the Plaintiff.

40.    Agents of NYC took the Infant-Plaintiff from the Plaintiff knowing that Plaintiff was the biological father of Infant-Plaintiff.

41.    Agents of NYC took the Infant-Plaintiff from the Plaintiff although they had known or had reason to know, or should have known that Plaintiff was the biological father of Infant-Plaintiff.

42.    Defendants took the Infant-Plaintiff from the Plaintiff although they had known or had reason to know, or should have known that Plaintiff was the closest kinship connection to the Infant-Plaintiff, and that there was no wrongdoing by the Plaintiff.

43.    Agents of NYC advised Plaintiff that he would be a "Non-Respondent"—accused of no wrongdoing or child protective concern.

44.    Although there were no accusations of wrongdoing, Defendants physically took away K.W.'s child, the Infant-Plaintiff, not even allowing K.W. to say goodbye or see his child.

45.   Prior to physically removing his infant son from Plaintiff, K.W., Defendants failed to consider and allow K.W. to live in a different residence from the Infant-Plaintiff's biological mother.

46.   Defendants treated Plaintiff worse than if they had considered him as a kinship resource for Infant-Plaintiff.

47.   Prior to physically removing his infant son from Plaintiff, K.W., Defendants failed to consider and/or seek that the mother of the Infant-Plaintiff be removed and/or restricted from contact with the Infant-Plaintiff.

48.   Prior to physically removing his infant son from Plaintiff, K.W., Defendants failed to consider and/or seek a less severe remedy prior to imposing the drastic remedy of physically removing K.A. from K.W.

49.    Defendants failed to consider whether staying with K.W. was in the best interest of the child, was to be with a kinship caregiver, such as K.W.

50.   Defendants failed to impose the least restrictive level of intrusion into the Plaintiffs' lives.

51.   Defendants told Plaintiff that his home was too small for him to live with Infant-Plaintiff.

52.   They told Plaintiff that even though he was not being accused of any wrongdoing, he would have to attend Court that same day and request the Infant-Plaintiff's return to his care and custody through a Family Court Judge presiding over a Family Court Child Protective proceeding.

53.   On or about March 8, 2017, the referenced Child Protective action, pursuant to Article Ten of the Family Court Act, solely charging the Infant-Plaintiff's mother with neglect was filed by petition before the New York County Family Court pursuant to Docket Number NN-05760-17.

54.   The Family Court Petition identified K.W. as the father or alleged to be father of K.A.

55.     The Family Court Petition did not identify any other fathers or alleged to be fathers of K.A.

56.     The Family Court Petition did not identify a single reason that there was insufficient time for Defendants to obtain a court order.

57.     The Family Court Petition did not identify any reasonable efforts that had been made by Defendants to prevent or eliminate the need for the removal of Infant-Plaintiff from Plaintiff.

58.     The family court petition falsely claimed that "the continuation of residence by the child in the child's home is or would be contrary to the welfare and best interests of the child and the temporary removal of said child from the child's place of residence is necessary to avoid imminent risk to the child's life or health. Continued placement of the child in the child's home would be contrary to the welfare and best interests of the child because:" But the sentence ended after the word "because" and no reason was given for the false blanket assertion.

59.     Even if Defendants had appropriately believed that Infant-Plaintiff needed to be separated from his mother, Defendants had no basis to remove Infant-Plaintiff from his father, Plaintiff.

60.     Defendants could have directed Plaintiff to keep Infant-Plaintiff away from Infant-Plaintiff's mother, but they did not.

61.     No reasonable efforts were made to keep Infant-Plaintiff with his father.

62.     There was no such filing against, K.W., the infant's father.

63.      The petition was arraigned before the Honorable Jane Pearl on that date.

64.     According to Family Court records, the Infant-Plaintiff was remanded to the temporary care and custody of ACS despite Plaintiff being a Non-Respondent, having not been accused of any wrongdoing, and having formally acknowledged paternity in the hospital upon Infant-Plaintiff's birth.

65.     The removal and remand of the subject child continued unlawfully from March 8, 2017 through November 13, 2019, when the child was finally "trial discharged" to Plaintiff.

66.     The Infant-Plaintiff was placed in a stranger ("non kinship") foster home operated by the Children's Aid Society for the next two years, eight months and seven days, through absolutely no fault of K.W. or K.A.

67.     As no allegations had been made against Plaintiff, there was no basis to restrict his access to his son to only a few hours of supervised visits per week.

68.     Plaintiff clearly and repeatedly articulated his objection to the removal of his son, the Infant-Plaintiff, from his care, his desperation to have him returned to his care, and his willingness to follow any and all court orders and conditions to have his son, Infant-Plaintiff returned to his care, while Defendants, repeatedly opposed his efforts to get his child back.

69.     On or about April 6, 2017, the New York County Family Court entered an order continuing Infant-Plaintiff's temporary placement in the custody ACS until the completion of the next permanency hearing or pending further orders of this court.  On the same date, Plaintiff was instructed to file for paternity and did so before the Bronx County Family Court, pursuant to Docket Number P-0597-17. Unfortunately, the Petition was deemed to be filed in the wrong county and was dismissed without prejudice.

70.     On or about April 19, 2017, ACS filed a motion seeking reasonable efforts to reunite the Infant-Plaintiff with his parents be excused pursuant to Section 1039(b) of the Family Court Act— despite Plaintiff being a Non-Respondent and having expressed clearly his desire to have his son returned immediately to his care, again opposing the reunification of K.W. and K.A.

71.     Despite Plaintiff having no child protective history and being a Non-Respondent, he was provided a "service plan" by CAS and was instructed that he had to comply with the recommended services and visit only supervised while at CAS offices for short periods of time.

72.     In or around April 2017, Plaintiff completed the parenting classes he was referred to by CAS, despite there being no reason that K.W. was made to take these classes.

73.     On or about May 26, 2017, Plaintiff filed a new paternity petition before the New York County Family Court.

74.     On or about August 1, 2017, the Court continued the placement of Infant-Plaintiff in the custody of ACS until the completion of the next permanency hearing or pending further orders of the court.

75.     On or about August 17, 2017, Plaintiff was adjudicated the legal father of Infant-Plaintiff and an Order of Filiation was entered. Despite the Order confirming Plaintiff as the legal father to Infant-Plaintiff, in addition to having no child protective concerns whatsoever, Infant-Plaintiff was still not returned to his father.

76.     Even though ACS had only brought neglect allegations against the Infant-Plaintiff's mother, ACS created service plans which required both Plaintiff and Infant-Plaintiff's mother to complete several courses and tasks.

77.     While ACS policy claims to be seeking the least restrictive intrusion into a family's life with respect to supervised visits, Defendants failed to seek the least restrictive intrusion into the lives of the Plaintiffs.

78.     Notably, Defendants had no legitimate safety concerns about Plaintiff and had not brought a case against Plaintiff, yet Defendants proactively prevented Plaintiffs from having unsupervised visits and prolonged their separation for approximately two years.

79. In or around November 17, 2017, ACS recommended for the Infant-Plaintiff to continue in foster care placement until both of the Infant-Plaintiff's birth parents had fully completed ACS's service plan for them.

80. Despite no abuse or neglect allegations against Plaintiff K.W., ACS demanded that Plaintiff, K.W., first complete a first aid/CPR class, a mental health evaluation, enroll into individual therapy if necessary, and undergo random drug screenings as requested by the agency before they would consent to Infant-Plaintiff being returned to his own father's care.

81. According to CAS, Plaintiff had already submitted to drug screenings as requested and had been testing negative, completed a mental health intake appointment at the Nathaniel Clinic and had scheduled an appointment to have a psychiatric evaluation completed. The agency noted that Plaintiff attended each of the agency visitations with the Infant-Plaintiff and observed positive bonding between the father and the child as Plaintiff always greeted his son with a smile, demonstrated affection and the child appeared excited and joyful when Plaintiff entered the room.

82. K.A. was separated from his father K.W, by Defendants.

83. K.A. was confined in a different residence away from his father K.W. by Defendants.

84. Neither K.A. not K.W. consented to the separation or confinement by Defendants

85. Upon information and belief K.A. knew that he was separated from his father K.W.

86. Upon information and belief K.A. knew that he was confined from his father K.W.

87. Defendants had no legal justification for K.A.'s confinement.

88. Despite no legitimate concerns or legal basis to oppose returning his son to his care, Defendants continued to object to Plaintiff being reunited with his son.

89.     On or about December 19, 2017, ACS submitted a permanency hearing report detailing that Plaintiff had completed all service plan directives. Nonetheless, the removal of Infant-Plaintiff from Plaintiff was continued.

90.     The permanency hearing report was sworn to by Defendant Gomez, wherein he states in pertinent part: "the agency recommends for the child K.A. to continue in foster care placement until the birth parents have fully completed their service plan…. A paternity test was completed and confirmed that he is the father of the child."

91.     The only reason provided for continuing to separate Plaintiff and Infant-Plaintiff was a prior ACS case against Plaintiff's mother.

92.     Upon information and belief, the prior ACS case was more than 20 years old.

93.     Upon information and belief, even though the only issue Defendants had with Plaintiff was that he lived with his mother, Defendants provided no financial assistance or other assistance to enable Plaintiff to obtain housing himself and Infant-Plaintiff.

94.     Upon information and belief, Defendants provided financial assistance to the foster parents, but none to keep Plaintiff united with his son prior to the "emergency removal."

95.     Further, even though Defendant Gomez' December 19, 2017 report referred to Plaintiff as the birth father, it still falsely referred to Plaintiff as the "Alleged Father" and not legally responsible for his son, Infant Plaintiff, in furtherance of Defendants' unjustified separation of Plaintiffs.

96.     Even though Plaintiff had complied with all of ACS' demands and was a non-respondent, Defendants continuously refused to return Infant-Plaintiff to his care.

97.     Upon information and belief, Defendants would not have taken his child away from him if he was a female.

98.     Upon information and belief, Defendants would not have taken his child away from him if he was not African American and/or Black.

99.     Upon information and belief, had Plaintiff been a white female, instead of a black male, Defendants would not have taken Infant-Plaintiff away from him and refused to return Infant-Plaintiff to his care.

100.    Upon information and belief, Plaintiff was treated less well by the Defendants because of his race.

101.    Upon information and belief, Plaintiff, K.W., was discriminated against by the Defendants because of his race.

102.    Upon information and belief, Plaintiff, K.W., was treated less well by the Defendants because of his gender.

103.    Upon information and belief, Plaintiff was discriminated against because of his gender.

104.    On or about April 4, 2018, ACS submitted a permanency hearing report against opposing K.W to be reunited with his baby, and instead recommending Infant-Plaintiff to remain in the current foster care placement until the birth parents have completed their service plans, ignoring the fact that Plaintiff had done so many months previously.

105.    The agency noted that Plaintiff had completed a psychiatric evaluation on in November 2017 and has not needed any further therapeutic referrals since. The report also noted that Plaintiff attended each of the agency visitations with his son, observing positive bonding between the father and the child.

106.    On or about May 21, 2018, the Family Court entered an Order directing Infant-Plaintiff to continue to be placed in the custody of the Commissioner of Social Services until the completion

of the next permanency hearing or pending further orders of this court. The Order permitted Plaintiff only to Agency supervised visits with the discretion of ACS to expand visitation.

107. On or about August 13, 2018, Plaintiff filed a petition before the New York County Family Court seeking full custody of his son.

108. On or about August 31, 2018, ACS submitted a report to the Family Court, opposing the petition, stating the parents still needed to complete the services recommended in their service plan. The report noted that Plaintiff was engaged in *voluntary* drug treatment at Odyssey House and continued to test negative for marijuana and all illegal substances. However, failing to note that Defendants service plan was the only reason that K.W. was in the voluntary drug treatment, and it was not because he had a drug problem.

109. On or about December 18, 2018, the Family Court entered an Order that Infant-Plaintiff shall continue to be placed in the custody of the Commissioner of Social Services until the completion of the next permanency hearing or pending further orders of this court and that the parents' visitation with Infant-Plaintiff may be expanded at ACS' discretion.

110. On or about March 28, 2019, Plaintiff completed all additional services beyond what the service plan he had previously satisfied nearly eighteen months previously, however, Defendants continued to oppose having K.W. get his infant son back.

111. On or about April 29, 2019, the Family Court entered an Order continuing placement of Infant-Plaintiff to be placed in the custody of the Commissioner of Social Services until the completion of the next permanency hearing or pending further orders of this court. The Court further ordered that unsupervised visiting time was to be put in place between the child and both parents, conditioned on compliance with the visiting coaching, random screens, and OPWDD services and mental services.

112.    In or around May 2019, Plaintiff, K.W., was diagnosed with dysthymic disorder, stemming from having his infant son taken from him, and was recommended to continue psychotherapy to help support his emotional state from being isolated from his son, Infant-Plaintiff.

113.    In or around June 18, 2019, Plaintiff's psychotherapist wrote a letter supporting his application to regain custody of child.

114.    For more than 2 years, Plaintiff was prevented by Defendants' actions from having any unsupervised time with his son, Infant-Plaintiff.

115.    Defendants' actions prevented Plaintiff, K.W., from witnessing Infant-Plaintiff's first step, first word, and many other important milestones.

116.    Defendants' actions kept Plaintiff, K.W., awake at night, not knowing whether his infant son was safe.

117.    On or about June 19, 2019, the Family Court entered an Order directing ACS to progressively expand to unsupervised day visits between Plaintiff and Infant-Plaintiff.

118.    On or about June 23, 2019, June 25, 2019, July 2, 2019, and July 3, 2019, Plaintiff had 3-hour visits with Infant-Plaintiff. On or about July 9, 2019 and July 11, 2019, Plaintiff had 3.5-hour visits with Infant Plaintiff. On or about July 16, 2019 and July 19, 2019, Plaintiff had 4-hour visits with Infant Plaintiff. On or about July 19, 2019, Plaintiff had a 7-hour visit with Infant Plaintiff. On or about July 25, 2019, Plaintiff had his first overnight visit with Infant-Plaintiff.

119.    On or about August 7, 2019, the Family Court entered an Order directing visits be continued between Plaintiff and Infant-Plaintiff.

120.    On or about September 20, 2019, ACS submitted a Permanency Hearing Report stating Plaintiff would like to plan for his son's return to his home (a position he had unambiguously

articulated for the previous two and one half years). The report continued that concerns regarding his parenting had been addressed, although no case had ever been brought against Plaintiff.

121.   On or about October 16, 2019, the Family Court entered an Order continuing to place the Infant-Plaintiff in the custody of the Commissioner of Social Services until the completion of the next permanency hearing or pending further orders of this court. Notably, the Order set a new permanency goal for Plaintiff to have custody of the Infant-Plaintiff.

122.   On or about October 23, 2019, the Family Court entered an Order stating that a conference was to be held within two (2) weeks as to modifying the Permanency Hearing Order to release Infant-Plaintiff to Plaintiff with supervision, since Defendants claimed that supervision was necessary even though no case had ever been brought against Plaintiff.

123.   On or about December 16, 2019, Infant-Plaintiff was released to the custody of Plaintiff with six (6) months ACS Supervision.

124.   On or about August 14, 2020, Plaintiff was finally granted sole legal and physical custody of the Infant-Plaintiff.

125.   According to ACS, in 2018 Black children were only 23% of the child population but made up more than 53% of the children in foster care. *See* Foster Care Research & Analysis Findings, NYC Administration for Children's Services Presentation to Child Welfare 20/21 Advisory Board (July 11, 2018), at 5

126.   During child protective investigations, ACS is obligated to assist adults in the home with obtaining necessary preventative services.  However, Black children are disproportionately less likely to be assisted with services to prevent family separation following a substantiated investigation.  *See* Report and recommendations of the Committee on Families and the Law Racial Justice and Child Welfare, April 22, at p. 16.

127.   Courts more frequently order Black children be "placed into congregate care rather than into a relative's home for the sole reason that the system deems that home too small, as families of color and various cultures live in a wide variety of arrangements, as compared with the more typical white, suburban, American household." *See* Cathy Krebs, It's Not Enough to Mean Well, The Imprint (Aug. 12, 2020), https://imprintnews.org/race/child-welfareracism-not-enough-to-mean-well/46360.

128.   In 2015, Gladys Carrion, then ACS commissioner, explained the multiple factors contributing to racial disparities in the child welfare system by saying, "One is that… poor families in this city and across the country are subject to more surveillance and oversight.  I think the other is really racism." *See* http://america.aljazeera.com/articles/2015/6/25/new-york-foster-care-system-racial-disparity.html

129.   A 2020 internal audit commissioned by ACS found that "White parents are presumed to be innocent and are repeatedly given opportunities to fail and try again,' the report states, 'while Black and Brown parents are treated at every juncture as if they are not competent parents capable of providing acceptable care to their children.'"   https://gothamist.com/news/nyc-childrens-agency-buries-report-that-details-racial-bias-in-its-ranks

130.   A draft report of the audit "described a 'predatory system that specifically targets Black and brown parents' and subjects them to 'a different level of scrutiny.'" https://www.nytimes.com/2022/11/22/nyregion/nyc-acs-racism-abuse-neglect.html

131.   "[A]ccording to the survey, A.C.S. workers and other participants said that rather than starting from a presumption of innocence, 'Black and brown parents are treated at every juncture as if they are not competent parents capable of providing acceptable care to their children.'"

132.  In 2022, the New York State Bar Association released the report, "Racial Justice and Child Welfare."

133.  "'This report details the travesty of unfair and unjust treatment of Black children and parents in our child welfare system,' said NYSBA President T. Andrew Brown. 'We mist take a hard look at a system that is inherently stacked against families of color." https://nysba.org/new-york-state-bar-association-finds-child-welfare-system-replete-with-systemic-racism-pushes-for-reforms/

134.  Defendants not only prevented Plaintiffs from living together but also from having regular unsupervised access to each other.

135.  Plaintiff was treated like a respondent who required supervision with his child.

136.  Although ACS has notice of the racial disparities and racism affecting black children and families in the child welfare system, ACS nevertheless allows these injustices to continue to occur, and allowed this injustice to unnecessarily separate K.W. and K.A., making K.W. and K.A. wait for years to be reunited.

137.  Plaintiffs have suffered substantial harm from this separation and the interference with their ability to have unfettered access to one another.

**FIRST CLAIM**
**(Interference with Right to Intimate Association**
**(By Plaintiffs Against all Defendants)**

138.  Plaintiffs re-allege and incorporate herein by reference each and every allegation contained in each preceding paragraph with the same force and effect as though each were fully set forth herein.

139.  As the Father and natural guardian of Infant-Plaintiff, Plaintiff is afforded the constitutional right to intimate association with each other.

140.  The right to intimate association guarantees an individual an intimate relationship

including, but not limited to, the raising of one's child free from undue intrusion by the State or any other individual or entity acting under color of law.

141. Defendants violated Plaintiffs' First Amendment right to intimate association by preventing Infant-Plaintiff from the care and custody of Plaintiff, advocating for and/or ensuring restriction of Plaintiff's parental access to Infant-Plaintiff, and advocating for and/or ensuring the restriction of residency of Infant-Plaintiff.

142. Defendants infringed upon Plaintiffs' First Amendment right to intimate association by advocating for and/or ensuring Infant-Plaintiff be removed from the care and custody of Plaintiff despite an Order declaring Plaintiff the legal father to Infant-Plaintiff and no child protective concerns whatsoever.

143. Defendants infringed upon Plaintiffs' rights for Infant-Plaintiff to be with his natural and biological father, and no child protective concerns whatsoever.

144. Defendants infringed upon Plaintiffs' rights to be free from unnecessary third-party intervention.

145. Defendants failed to impose and/or to seek to impose the least restrictive level of intrusion into the Plaintiffs' lives.

146. Defendants had no exception nor reasonable basis to interfere with Plaintiffs' right to intimate association with each other.

147. Defendants acted under color of law.

148. The foregoing actions and inactions of Defendants amount to a policy, pattern, practice or custom that is inconsistent with the exercise of professional judgment and amounts to deliberate indifference and conscience-shocking violation of Plaintiffs' constitutional rights.

149. As a result of Defendants' conduct, Plaintiffs have been deprived of their right to

family integrity and association, of their right to be free from unnecessary and unreasonable intrusion into their mental and emotional stability and well-being, and of their right to be under governmental care or supervision no longer than is necessary, as conferred on them by the Fourteenth Amendments to the United States Constitution.

150.     As a direct and proximate result of the misconduct and abuse of authority stated above, Plaintiffs sustained the damages alleged herein.

## SECOND CLAIM
### Federal False Arrest
### (By Infant-Plaintiff Against Defendant Moody)

151.     Plaintiffs re-allege and incorporate herein by reference each and every allegation contained in each preceding paragraph with the same force and effect as though each were fully set forth herein

152.     Defendant Moody intentionally confined Infant-Plaintiff

153.     Infant-Plaintiff did not consent to the confinement.

154.     Defendant Moody lacked justification for the confinement.

155.     Defendant Moody acted under color of law

156.     As a direct and proximate result of this unlawful conduct, Infant-Plaintiff sustained the damages herein before alleged.

## THIRD CLAIM
### Racial Discrimination (Fourteenth Amendment)
### (By Plaintiffs Against Defendant NYC)

157.     Plaintiffs re-allege and incorporate herein by reference each and every allegation contained in each preceding paragraph with the same force and effect as though each were fully set forth herein.

158.     Defendant NYC has implemented and enforced a practice and/or custom of improperly removing children from their parents and interfering with parental custody, care, and control based on race rather than risk of harm to the child.

159.     Defendant NYC acted with intent and deliberate indifference to Plaintiffs Fourteenth Amendment rights.

160.     Defendant NYC's discriminatory policy, practice, and/or custom includes but is not limited to pressuring ACS staff to remove children and/or interfere with parental custody, care, and control when the parent is Black and failing to take obviously necessary action to prevent improper removals and/or interference with parental rights in black families.

161.     As a direct and proximate result of the aforesaid acts and omissions of Defendant NYC, and as. Direct and proximate result of Defendant NYC's discriminatory policy, practice, and/or custom, Defendant NYC acted under color of law to forcibly and improperly separate Plaintiff from Infant-Plaintiff and interfere with his parental rights, violating Plaintiffs' rights under Fourteenth Amendment rights.

162.     As a result of Defendant NYC's actions, in violation of the Constitution, Plaintiffs suffered humiliation, pain and suffering, terror, and mental anguish and other financial losses.

**FOURTH CLAIM**
**Racial Discrimination (New York Constitution)**
**Violation of Article I, §11 of the New York State Constitution**
**(By Plaintiffs Against Defendant NYC)**

163.     Plaintiffs re-allege and incorporate herein by reference each and every allegation contained in each preceding paragraph with the same force and effect as though each were fully set forth herein.

164.     Defendant NYC has implemented and enforced a practice and/or custom of improperly removing children from their parents and interfering with parental custody, care, and control based on race rather than risk of harm to the child.

165.     Defendant NYC's discriminatory policy, practice, and/or custom includes but is not limited to pressuring ACS staff to remove children and/or interfere with parental custody, care, and control when the parent is Black and failing to take obviously necessary action to prevent improper removals and/or interference with parental rights in black families,

166.     As a direct and proximate result of the aforesaid acts and omissions of Defendant NYC, and as. Direct and proximate result of Defendant NYC's discriminatory policy, practice, and/or custom, Defendant NYC acted under color of law to forcibly and improperly separate Plaintiff from Infant-Plaintiff and interfere with his parental rights based on his race, violating Plaintiffs' rights under the New York State Constitution.

167.     As a result of Defendant NYC's actions, in violation of the New York State Constitution, Plaintiffs suffered humiliation, pain and suffering, terror, and mental anguish and other financial losses.

**FIFTH CLAIM**
**Procedural Due Process (Fourteenth Amendment)**
**(By Plaintiffs Against All Defendants)**

168.     Plaintiffs repeat, reallege and incorporate each and every allegation contained in the paragraphs above as more fully set forth herein.

169.     Plaintiff had a protected liberty interest in the care and custody of his child Infant-Plaintiff, as mandated by the United States Constitution.

170.     Infant-Plaintiff had a protected liberty interest in his father Plaintiff having care and custody of him, as mandated by the United States Constitution.

171.     Based on the alleged conduct herein, the Individual Defendants' actions against Plaintiffs deprived them of due process.

172.     There was no lawful basis for the Individual Defendants' actions, which were clearly prohibited by the United States Constitution.

173.     The foregoing actions and inactions of Defendants amount to a policy, pattern, practice or custom that is inconsistent with the exercise of professional judgment and amounts to deliberate indifference and conscience-shocking violation of Plaintiffs' constitutional rights.

174.     As a result of Defendants' conduct, Plaintiffs have been deprived of their right to family integrity and association, of their right to be free from unnecessary and unreasonable intrusion into their mental and emotional stability and well-being, and of their right to be under governmental care or supervision no longer than is necessary, as conferred on them by the Fourteenth Amendments to the United States Constitution.

175.     As a result, Plaintiffs suffered humiliation, pain and suffering, terror, and mental anguish and other financial losses.

## SIXTH CLAIM
### Procedural Due Process: New York Constitution
### (By Plaintiffs Against All Defendants)

176.     Plaintiffs repeat, reallege and incorporate each and every allegation contained in the paragraphs above as more fully set forth herein.

177.     Article I, Section 6 of the New York State Constitution states that "No Person shall be deprived of life, liberty, or property without due process of law."

178.     Plaintiff had a protected liberty interest in the care and custody of his child Infant-Plaintiff, as mandated by the New York State Constitution.

179.     Infant-Plaintiff had a protected liberty interest in his father Plaintiff having care and custody of him, as mandated by the New York State Constitution.

180.     Based on the alleged conduct herein, Defendants' actions against Plaintiffs deprived them of due process.

181.     There was no lawful basis for Defendants' actions, which were clearly prohibited by the New York State Constitution.

182.     The foregoing actions and inactions of Defendants amount to a policy, pattern, practice or custom that is inconsistent with the exercise of professional judgment and amounts to deliberate indifference and conscience-shocking violation of Plaintiffs' constitutional rights.

183.     As a result of Defendants' conduct, Plaintiffs have been deprived of their right to family integrity and association, of their right to be free from unnecessary and unreasonable intrusion into their mental and emotional stability and well-being, and of their right to be under governmental care or supervision no longer than is necessary, as conferred on them by Article I, Section 6 of the New York State Constitution.

184.     As a result, Plaintiffs suffered humiliation, pain and suffering, terror, and mental anguish and other financial losses.


**SEVENTH CLAIM**
**(Gender Discrimination in Violation of the New York City Human Rights Law)**
**(By Plaintiffs Against All Defendants)**

185.     Plaintiffs repeat, reallege and incorporate each and every allegation contained in the paragraphs above as more fully set forth herein.

186.     The acts which constitute and form this cause of action were perpetrated upon Plaintiffs while they were being provided services by ACS and CAS and while Plaintiffs were protected under the New York City Human Rights Law ("NYCHRL") because of Plaintiff's gender.

187.    Plaintiff at all relevant times herein, was a member of a protected class under the NYCHRL because he is and was a male.

188.    ACS provides services to the public.

189.    Defendant NYC is subject to the NYCHRL because it provides services as a public accommodation.

190.    Defendants Moody, Gomez, and CAS were all contracted by NYC to assist in providing public accommodations.

191.    Defendants Moody, Gomez, and CAS were all agents of NYC.

192.    Defendants all acted under color of law.

193.    Defendants had notice of Plaintiff's gender.

194.    Defendants regularly permit mothers to retain custody of their children when they are non-respondents.

195.    Defendants often permit mothers who are respondents to retain custody of their children.

196.    Plaintiff was treated less well than mothers are treated by Defendants when they removed Infant-Plaintiff from his custody, limited his visitation to only a few hours per week and kept him from the care and custody his son for years without justification.

197.    Had K.W. been a mother, the Infant-Plaintiff would not have been taken, based on the circumstances that were present when K.A. was summarily removed from K.W.'s life.

198.    Even though K.W. was a non-respondent parent and K.A.'s mother had extensive ACS history, Defendants conditioned K.A.'s return to K.W. on K.A.'s mother fulfilling ACS's requirements.

199.    As K.W. was a non-respondent parent, he was treated less well than K.A.'s mother.

200. The facts alleged herein constitute unlawful discrimination against Plaintiff by Defendants, based on Plaintiff's gender, in violation of Chapter 1, Title 8 of the Administrative Code of the City of New York, §8-107(4)(a)("the New York City Human Rights Law"), which, *inter alia*, states that:

> It shall be unlawful discriminatory practice for any person who is…
> an agent or employee or agent of any place or provider of public
> accommodation, because of any person's actual or perceived race,
> creed, color, national origin, age, gender… directly or indirectly to
> refuse, withhold from or deny to such person the full and equal en-
> joyment, on equal terms and conditions, of any of the accommoda-
> tions , advantages, services, facilities or privileges of the place or
> provider of public accommodation."

201. As a direct and proximate result of Defendants' violation of the NYCHRL Defendants are liable to Plaintiffs pursuant to §8-502(a) of said statute for "damages including punitive damages," and pursuant to §8-502(f) of said statute for "costs and reasonable attorney's fees," based on the lodestar method, as has been judicially established and accepted as a means of calculating attorney's fees, when they are properly available under the law, or as they are here, and for pre-judgment interest.

202. Plaintiffs have been adversely affected in their enjoyment of each other and suffered a significant loss of parent-child bonding.

203. In addition to being adversely affected in his enjoyment of his son and suffering a significant loss of parent-child bonding, Plaintiff has also been humiliated, demeaned and degraded, all of which has been caused by Defendants' unlawful conduct due to discrimination based on Plaintiff's gender, in violation of Plaintiff's human rights.

204.    As a direct and proximate result of Defendants' conduct complained of herein, Plaintiffs have suffered damages, injuries and losses, both actual and prospective, which include psychological damage, and the emotional pain and suffering Plaintiffs have been caused to suffer, and the impact upon the quality of their life and well-being.

205.    Plaintiff was discriminated against due to his gender when Defendants removed Infant-Plaintiff from his custody, limited his visitation to only a few hours per week and kept him from the care and custody his son for years without justification.

206.    Had K.W. been a mother, the Infant-Plaintiff would not have been taken, based on the circumstances that were present when K.A. was summarily removed from K.W.

207.    The acts of Defendants were egregious and committed with reckless indifference in the face of a perceived risk that its actions would violate Plaintiffs' protected rights under the NY-CHRL, so that, in addition to damages inflicted upon Plaintiffs and in addition to all the other measures of relief to which Plaintiffs may be properly entitled herein, Defendants should also be required to pay punitive damages for their discriminatory conduct in order to deter Defendants and others similarly situated from engaging in such conduct in the future.

The Individual Defendants at all relevant times acted under color of law.

### EIGHTH CLAIM
### (Race Discrimination in Violation of the New York City Human Rights Law)
### (By Plaintiffs Against All Defendants)

208.    Plaintiffs repeat, reallege and incorporate each and every allegation contained in the paragraphs above as more fully set forth herein.

209.    The acts which constitute and form this cause of action were perpetrated upon Plaintiffs while they were being provided services by ACS and CAS and while they were protected under the New York City Human Rights Law ("NYCHRL") because of their race.

210. Plaintiffs at all relevant times herein, were members of a protected class under the NY-CHRL because they are and were Black.

211. ACS provides services to the public.

212. Defendant NYC is subject to the NYCHRL because it provides services as a public accommodation.

213. Defendants Moody, Gomez, and CAS were all contracted by ACS and NYC to assist in providing public accommodations.

214. Defendants Moody, Gomez, and CAS were all agents of NYC.

215. Defendants all acted under color of law.

216. Defendants had notice of Plaintiffs' race.

217. Defendants regularly permit non-Black parents to retain custody of their children when they are non-respondents.

218. Defendants often permit non-Black parents who are respondents to retain custody of their children.

219. Plaintiffs were treated less well than non-Black parents are treated by Defendants when they removed Infant-Plaintiff from Plaintiff's custody, limited their visitation to only a few hours per week and kept Infant-Plaintiff from the care and custody of Plaintiff for years without justification.

220. The facts alleged herein constitute unlawful discrimination against Plaintiffs by Defendants, based on Plaintiffs' race, in violation of Chapter 1, Title 8 of the Administrative Code of the City of New York, §8-107(4)(a)("the New York City Human Rights Law"), which, *inter alia*, states that:

> It shall be unlawful discriminatory practice for any person who is…
> an agent or employee or agent of any place or provider of public

accommodation, because of any person's actual or perceived race, creed, color, national origin, age, gender… directly or indirectly to refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations , advantages, services, facilities or privileges of the place or provider of public accommodation."

221.    As a direct and proximate result of Defendants' violation of the NYCHRL Defendants are liable to Plaintiffs pursuant to §8-502(a) of said statute for "damages including punitive damages," and pursuant to §8-502(f) of said statute for "costs and reasonable attorney's fees," based on the lodestar method, as has been judicially established and accepted as a means of calculating attorney's fees, when they are properly available under the law, or as they are here, and for pre-judgment interest.

222.    In addition to being adversely affected in his enjoyment of his son and suffering a significant loss of parent-child bonding, Plaintiffs have been humiliated, demeaned and degraded, all of which has been caused by Defendants' unlawful conduct due to discrimination based on Plaintiffs' race, in violation of Plaintiffs' human rights.

223.    As a direct and proximate result of Defendants' conduct complained of herein, Plaintiff has suffered damages, injuries and losses, both actual and prospective, which include damage to his relationship with his son, psychological damage, and the emotional pain and suffering Plaintiff has been caused to suffer, and the impact upon the quality of life and her well-being.

224.    The acts of Defendants were egregious and committed with reckless indifference in the face of a perceived risk that its actions would violate Plaintiff's protected rights under the NYCHRL, so that, in addition to damages inflicted upon Plaintiff and in addition to all the other measures of relief to which Plaintiff may be properly entitled herein, Defendants should also be

required to pay punitive damages for their discriminatory conduct in order to deter Defendants and others similarly situated from engaging in such conduct in the future.

### NINTH CLAIM
### Procedural Due Process Violation of the Fourteenth Amendment
### (By Plaintiffs Against the Defendant Moody)

225.    Plaintiffs hereby incorporate the allegations in paragraphs above as if fully set forth herein.

226.    The right of a parent to stay with and raise her or his child is a constitutionally protected liberty interest within the meaning of the Due Process Clause of the Fourteenth Amendment.

227.    Children have a parallel constitutionally protected liberty interest in not being dislocated from the emotional attachments that derive from the intimacy of daily family association.

228.    The Fourteenth Amendment imposes a requirement that judicial process must be afforded both parent and child before removal of the child from his or her parent's custody may be effected.

229.    Defendant Moody denied Plaintiffs procedural due  process, to which they were entitled before being deprived of their constitutionally protected right to family integrity.

230.    Defendant Moody acted with deliberate, reckless, and callous indifference to Plaintiffs' constitutionally protected rights to family integrity and procedural due process.

231.    Defendant Moody denied Plaintiffs' procedural due process, and this denial caused K.A. to be removed from K.W.'s care.

232.    The removal of Infant-Plaintiff from Plaintiff's care caused significant harm.


## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully request that judgment be entered:

a. Awarding Plaintiffs full and fair compensatory damages in an amount to be determined by the jury;
b. Awarding Plaintiffs full and fair punitive damages in an amount to be determined by the jury;

  c. Awarding Plaintiffs costs;

  d. Awarding Plaintiffs reasonable attorneys' fees; and,

  e. Granting such other relief as this Court may deem just and proper.

DATED:   May 26, 2023
       New York, New York

         BRUSTEIN LAW, PLLC


        By:  _____/s/ *Evan Brustein*_____
            Evan Brustein, Esq.
            Attorneys for Plaintiff
            299 Broadway, 17th Floor
            New York, New York 10007
            Tel:  (212) 233-3900
            Fax: (212) 285-0531