UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
K.W., on behalf of himself and his
infant child, K.A.,

        Plaintiffs,

     - against -

THE CITY OF NEW YORK, AMAR MOODY,
THE CHILDREN'S AID SOCIETY, and BRIAN
GOMEZ,

        Defendants.
-----------------------------------X

**MEMORANDUM AND ORDER**

22 Civ. 8889 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

On March 8, 2017, infant child K.A. ("K.A.") was removed from the custody of his parents, including his father, K.W. ("K.W." and together with K.A., "plaintiffs"), pursuant to New York's emergency removal procedures.  Later the same day, a family court authorized the propriety of K.A.'s removal because of emergent concerns about K.A.'s health and safety, including that K.A.'s mother had been previously deemed neglectful of ten other children, questions about K.W.'s paternity, and K.W.'s inability to keep K.A. physically separated from his mother.  Due to ongoing fears about K.W.'s ability to ensure K.A.'s well-being, the family court repeatedly authorized their continued separation until December 16, 2019, when K.A. was reunited with his father.

On October 18, 2022, K.W. brought this action on behalf of himself and his son, asserting numerous federal and state law

claims against (1) the City of New York (the "City"), (2) the municipal caseworker assigned to K.A.'s case Amar Moody ("Moody" and together with the City, the "City Defendants"), (3) the not-for-profit corporation Children's Aid Society ("CAS"), and (4) and CAS employee Brian Gomez ("Gomez" and together with CAS, the "Non-Profit Defendants").[1]  The City Defendants have now moved to dismiss all but one of plaintiffs' claims against them.  For the following reasons, we grant the motion and further find that the sole remaining claim against the City Defendants is also subject to dismissal.

## BACKGROUND

### A.   Factual Background

Although we assume, as we must, the truth of the factual allegations included in plaintiffs' First Amended Complaint, ECF No. 35 ("FAC"), see Kalnit v. Eichler, 264 F.3d 131, 135 (2d Cir. 2001), we cannot rely solely on plaintiffs' complaint because it selectively omits critical facts found in the family court petitions and orders, which were provided by the parties on the Court's request.  These family court records, which the Court can

---

[1] The City Defendants and Non-Profit Defendants will be referred to, collectively, as "defendants."

consider on a motion to dismiss, fill in the glaring gaps left
open by plaintiffs' complaint, and therefore serve as the basis
for the remainder of the following factual background. See Dabah
v. Franklin, 19 Civ. 10579 (ALC), 2022 WL 973834, at *2 (S.D.N.Y.
Mar. 31, 2022), aff'd 2023 WL 3577872 (2d Cir. May 22, 2023).

K.W. is a Black male who resides in Bronx County, New York,
and is the father and natural guardian of K.A.  FAC ¶ 5.  The City
operates the Administration for Children Services ("ACS"), the
City's agency that oversees the safety and well-being of the City's
children and is "responsible for the appointment, training,
supervision, promotion and discipline of case workers and
supervisory case workers," including Moody, who, at all relevant
times, was employed by ACS as a Child Protective Specialist ("CPS")
and assigned to K.A.'s case.  Id. ¶¶ 8-9, 12-13.

CAS is a not-for-profit corporation and "authorized agency,"
as defined by New York Social Services Law § 371, that helps place
children in foster care and is "responsible for the appointment,
training, supervision, promotion and discipline of case workers
and supervisory case workers," including Gomez, who, at all
relevant times, was employed by CAS as a Case Planner and assigned
to K.A.'s case.  Id. ¶¶ 14-17.

K.A. was born at Bronx Lebanon Hospital in Bronx County, New York, on March 2, 2017.  Id. ¶ 21.  At the hospital, K.W. allegedly executed an acknowledgment of paternity as to K.A., who was released to K.W.'s custody upon discharge from the hospital.  Id. ¶¶ 21-22.  At the time, K.W. was residing in an apartment he shared with K.A.'s mother, who, according to family court filings, but not plaintiffs' complaint, had been deemed neglectful of ten different children prior to having K.A.  See ECF No. 61-15 ("Pet.") ¶ 4, Addendum I ¶ 1.  Five days after K.A. was born, on March 7, 2017, Moody and another CPS employed by ACS appeared at K.W.'s residence to do a welfare check on K.A.  FAC ¶ 23.  During the visit, Moody allegedly told K.W. that he, K.A., and K.A.'s mother were all required to attend a meeting at ACS's office the following day.  Id. ¶ 28.

On March 8, 2017, K.W. arrived at ACS's office with K.A., as directed.[2]  Id. ¶ 29.  Upon entering the meeting, Moody and another ACS employee allegedly informed K.W. that K.A. "should be left with ACS staff" during the meeting.  Id. ¶ 30.  Complying with this instruction, K.W. handed K.A. to an ACS staff member to watch him while the meeting was conducted.  Id.  According to the complaint, after the meeting started, K.W. was informed that K.A.

---

[2] It is unclear from the complaint whether K.A.'s mother attended the meeting.

was being removed from his custody due to allegations against K.A.'s mother.  Id. ¶ 32.  Upon hearing the news, K.W. "fell to his knees crying and screaming."  Id. ¶ 33.  As alleged, "[d]efendants took away [K.A.]" without "allowing [K.W.] to say goodbye or see his child."  Id. ¶ 44.

Thereafter, K.W. was advised that he would be a "Non-Respondent" in child protective proceedings, meaning that he was "accused of no wrongdoing or child protective concern."  Id. ¶ 43. Although K.W. alleges that "[d]efendants failed to consider whether staying with [K.W.] was in the best interest of [K.A.]," he also acknowledges that "[d]efendants told [him] that his home," which he shared with K.A.'s mother, "was too small for him to live with [K.A.]."  Id. ¶¶ 49, 51.

On the same day, March 8, 2017, just hours after K.A. had been removed from K.W.'s custody, the City Defendants filed a child protective proceeding in the New York County Family Court (the "Family Court").  Id. ¶ 53.  The City Defendants stated in their petition that K.W. "is or is alleged to be" K.A.'s father, and, although plaintiffs' complaint omits the following facts, that K.A.'s mother had been adjudicated neglectful of ten prior children due to her (1) failure to "plan for her children," (2) untreated mental health diagnosis of depression, (3) positive toxicology

-5-

test results for cocaine and marijuana while not participating in a drug treatment program, and (4) failure to comply with prior court orders. Pet., Addendum I ¶ 1. Moreover, at the time the petition was filed, another child of K.A.'s mother was in the City's custody based on the Family Court's finding that the child "would be at risk of further abuse or neglect if return to the respondent mother." Id. Based on these facts, the City Defendants concluded that:

> the continuation of residence by the child in the child's home is or would be contrary to the welfare and best interests of the child and the temporary removal of said child from the child's place of residence is necessary to avoid imminent risk to the child's life or health. Continued placement of the child in the child's home would be contrary to the welfare and best interests of the child because:
>
> [x] Reasonable efforts to prevent or eliminate the need for the above-described removal[] were provided prior to the date of the hearing as follows:
>
> Imminent risk of the child would not be eliminated by the issuance of a temporary order of protection.[3]

Id., Addendum III; see also FAC ¶ 58.

---

[3] Plaintiffs harp on the fact that the first paragraph ended after the word "because" and claim that no reason was given for the assertion that K.A.'s continued placement in K.W.'s home "would be contrary to the welfare and best interests of [K.A.]." FAC ¶ 58. However, as seen above, the paragraph directly following "because" continues by explaining that "[r]easonable efforts to prevent or eliminate the need for the above-described removal [] were provided prior to the date of the hearing[.]" Pet., Addendum III. In any event, as discussed below, the petition, when viewed in its entirety, gives ample reason to support the assertion that K.A.'s continued placement in K.W.'s home would be contrary to his welfare and best interests.

Later the same day, March 8, 2017, the Family Court entered an order remanding K.A. to the temporary care and custody of ACS pursuant to New York Family Court Act § 1027.  FAC ¶¶ 63-65; see also ECF No. 61-14 ("Removal Order").  According to the Family Court order, K.A.'s mother "ha[d] not engaged in services to address the risk posed to [K.A.'s] siblings" despite that she had been "referred for services numerous times by ACS and/or foster care agency over the past several years."  Removal Order at 1.  Moreover, the Family Court found that imminent risk to K.A. "would not be eliminated by the issuance of an order of protection directing the removal of any person from the child's residence," meaning that removing K.A. from his parents' residence was the only way to protect him from neglect.  Id.

The allegedly unlawful removal of K.A. from K.W.'s custody continued from March 8, 2017 through December 16, 2019.  FAC ¶¶ 65, 123.  During that nearly three-year period, K.A. was placed in a "non-kinship" foster home operated by the CAS.  Id. ¶¶ 66-67.  At the beginning of the separation period, K.W. was limited to "a few hours of supervised visits [with K.A.] per week."  Id. ¶ 67.

On April 6, 2017, the Family Court entered an order continuing K.A.'s temporary placement in the custody of ACS until the completion of the next permanency hearing or pending further orders

of the court.  Id. ¶ 69.  In the Family Court's view, such continued placement was necessary "due to the best interests and safety needs of [K.A.] and that [K.A.] would be at risk of further abuse or neglect if returned to the parent/respondent."  ECF No. 61-5 at 2. Meanwhile, on the same day, plaintiffs allege that K.W. was instructed, presumably by the Family Court, to file a paternity petition, which he did on May 26, 2017.  FAC ¶¶ 69, 73.  Plaintiffs further allege that around this time, CAS provided K.W. a "service plan" that required him to take parenting classes, which he completed.  Id. ¶¶ 71-72.

On August 1, 2017, the Family Court again ordered K.A.'s continued placement in the custody of ACS until the next permanency hearing or pending further orders of the court.  Id. ¶ 74; ECF No. 61-6.  On August 17, 2017, K.W. was deemed K.A.'s legal father and an Order of Filiation was entered.[4]  FAC ¶ 75.  Apparently around this time, ACS also allegedly created "service plans" which required both K.W. and K.A.'s mother to complete several courses and tasks.  Id. ¶ 76.

On November 17, 2017, ACS allegedly recommended that K.A. continue in foster care placement until both of K.A.'s biological

---

[4] Family Court documents suggest that this order was issued on July 17, 2017, rather than on August 17, 2017, as plaintiffs state.  See ECF No. 61-4.

parents completed ACS's service plan.  Id. ¶ 79.  Pursuant to this plan, K.W. asserts that he, among other things, completed a psychiatric evaluation, which "observed positive bonding" between K.W. and K.A., and submitted to drug screenings, which he passed.[5] Id. ¶ 81.

On December 19, 2017, ACS allegedly submitted a permanency hearing report confirming that K.W. was K.A.'s father and stating that K.W. had completed all service plan directives but still "recommend[ed]" that K.A. "continue in foster care placement until the birth parents have fully completed their service plan."  Id. ¶¶ 89-90.  According to K.W., "[t]he only reason provided for continuing to separate [him] and [K.A.] was a prior ACS case against [K.W.'s] mother."  Id. ¶ 91.  However, as more fully discussed below, subsequent Family Court filings reveal that the City Defendants had serious reservations about granting K.W. custody of K.A., including, as plaintiffs alluded to, that K.W. moved into a one-bedroom apartment with his own birth mother whose parental rights had been terminated during K.W.'s childhood.  See ECF No. 61-17 at 2-3, 5.

---

[5] However, Family Court documents suggest that K.W. later tested positive for marijuana in December 2018, January 2019, and May 2019, and that K.W. refused to submit to further drug tests.  See ECF No. 61-17 at 2.

On May 21, 2018, the Family Court once again directed that K.A. continue his placement in foster care and permitted K.W. supervised visits, though ACS was granted discretion to expand visitation rights. FAC ¶ 106; ECF No. 61-2.

On August 13, 2018, K.W. filed a petition in the Family Court seeking full custody of K.A. FAC ¶ 107; ECF No. 61-4. On August 31, 2018, ACS allegedly opposed the petition, stating that "the parents still needed to complete the services recommended in their service plan." FAC ¶ 108. Accordingly, on December 18, 2018, the Family Court ordered K.A.'s continued placement in the custody of ACS. Id. ¶ 109; ECF No. 61-13. However, the Family Court also noted that the permanency goal for K.A. was "reunification with the parent(s)" and directed K.W. to submit to "biweekly random drug screens" and provide copies of his prior mental health evaluation. ECF No. 61-13 at 2. On March 28, 2019, K.W. alleges that he "completed all additional services" beyond what the initial service plan had required. FAC ¶ 110.

On April 29, 2019, the Family Court continued K.A.'s placement in ACS custody for his well-being while simultaneously expanding visitation rights for both parents. Id. ¶ 111; ECF No. 61-11. On June 19, 2019, the Family Court entered another order directing ACS to progressively expand visitation to unsupervised day visits

between K.W. and K.A.  Id. ¶ 118; ECF No. 61-7.  The Family Court's order made clear that "[n]o other adult is to be present during such visits unless agreed upon by agency director via phone" and that K.A. "is not to be brought to the home of [K.W.'s] biological mother.  ECF No. 61-7.

Accordingly, throughout June and July that year, K.W. had numerous visits with K.A., including his first overnight visit on July 25, 2019.  FAC ¶ 118; see also ECF No. 61-3.  Despite this apparent progress, Family Court records show that defendants still had significant concerns about granting K.W. custody of K.A., including that K.W. (1) still did not have "adequate housing," (2) tested positive for marijuana several times, and (3) exhibited "poor judgment" by allowing K.A.'s mother to be present during his unsupervised visits with K.A., in direct contravention of the Family Court's order.  ECF No. 61-17 at 2-3, 5; see also ECF No. 61-3 at 2-3 (noting K.W.'s housing issues, possible marijuana usage, and decision to allow K.A.'s mother to attend unsupervised visits).  Additionally, K.W. "often" returned K.A. from his supervised visits "with a wet diaper" and, on at least one occasion, wearing clothes that were "soaked with urine," which raised legitimate concerns about K.W.'s parenting abilities.  ECF No. 61-3 at 3.

On October 16, 2019, the Family Court continued to place K.A. in the custody of ACS, but the order set a new permanency goal for K.W. to gain full custody of K.A. FAC ¶ 121; ECF No. 61-12. Two months later, on December 16, 2019, K.A. was released to K.W.'s custody with six months of ACS supervision, and the following year, on August 14, 2020, K.W. was granted sole legal and physical custody of K.A. Id. ¶¶ 123-24; ECF Nos. 61-16, 61-18.

**B. Procedural History**

On October 18, 2022, K.W. commenced this action on behalf of both himself and K.A. ECF No. 1. On February 17, 2023, the City Defendants -- the City and Moody -- filed a pre-motion letter regarding their anticipated motion to partially dismiss plaintiffs' complaint.[6] ECF No. 26. On March 1, 2023, plaintiffs responded in opposition to the City Defendants' pre-motion letter. ECF No. 28. On April 24, 2023, the Court determined that the City Defendants could bring their motion without the necessity of a pre-motion conference but granted plaintiffs leave to file an amended complaint. ECF No. 32. Accordingly, on May 26, 2023, plaintiffs filed the First Amended Complaint. ECF No. 35.

---

[6] On April 21, 2023, the Non-Profit Defendants answered plaintiffs' initial complaint, ECF No. 31, and subsequently answered the First Amended Complaint on June 20, 2023, ECF No. 39.

In their First Amended Complaint, plaintiffs assert nine causes of action, namely (1) interference with the right to intimate association against all defendants; (2) federal false arrest asserted only by K.A. against Moody; (3) race discrimination under the Fourteenth Amendment against the City; (4) race discrimination under Article I, Section 11 of the New York Constitution against the City; (5) violation of procedural due process under the Fourteenth Amendment against all defendants; (6) procedural due process under the New York Constitution against all defendants; (7) gender discrimination in violation of the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101 et seq., against all defendants; (8) race discrimination in violation of the NYCHRL against all defendants; and (9) another procedural due process violation under the Fourteenth Amendment against Moody. FAC ¶¶ 138-232. Plaintiffs seek, among other things, both compensatory and punitive damages. See id.

On September 22, 2023, the City Defendants filed their motion to partially dismiss the First Amended Complaint. ECF Nos. 46-48. Plaintiffs filed their opposition to the motion on December 22, 2023, ECF No. 51, and the City Defendants filed their reply in further support of their motion on February 28, 2024, ECF No. 56. On May 28, 2024, the Court requested that the City Defendants file

the relevant Family Court records under seal, ECF No. 57, which
the City Defendants did on June 5, 2024, ECF No. 61.[7]

## <u>LEGAL STANDARD</u>

The City Defendants seek dismissal of plaintiffs' claims
under Federal Rule of Civil Procedure 12(b)(6).  To survive a
motion to dismiss under Rule 12(b)(6), a complaint must include
"enough facts to state a claim that is plausible on its face."
<u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).  A claim is
facially plausible "when the plaintiff pleads factual content that
allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged."  <u>Ashcroft v.
Iqbal</u>, 556 U.S. 662, 678 (2009).  A court must accept as true all
factual allegations in the complaint and draw all reasonable
inferences in plaintiff's favor.  <u>Acticon AG v. China N.E. Petrol.
Holdings Ltd.</u>, 692 F.3d 34, 37 (2d Cir. 2012).

In evaluating the sufficiency of a complaint, a "court may
consider the facts alleged in the complaint, documents attached to
the complaint as exhibits, and documents incorporated by reference

---

[7] The City Defendants initially filed these records <u>ex parte</u>, rather than under
seal, ECF No. 61, but after plaintiffs raised this issue and the Court held a
conference with the parties, the Court changed the viewing capabilities so that
all parties to this litigation can access the documents filed by the City
Defendants at ECF No. 61.

in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010). Of particular importance here, the Court may also consider "matters of which judicial notice may be taken," Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002), including relevant "court records of the family court proceeding," Dabah, 2022 WL 973834, at *2. Moreover, because these family court records are "integral" to plaintiffs' claims, the Court may consider them alongside the operative complaint. See id.

## DISCUSSION

The City Defendants seek dismissal of all plaintiffs' claims except K.A.'s intimate association claim. Accordingly, the City Defendants maintain that dismissal of the following claims is warranted: (1) K.W.'s claim of interference with the right to intimate association; (2) plaintiffs' procedural due process claims under the Fourteenth Amendment; (3) K.A.'s false arrest claim against Moody; (4) plaintiffs' race and gender discrimination claims under the NYCHRL; and (5) plaintiffs' race discrimination claims under the Fourteenth Amendment against the City. See ECF No. 47 ("Mot.") at 3-12, 17-18.[8] The City Defendants

---

[8] The City Defendants also sought dismissal of plaintiffs' procedural due process and race discrimination claims under the New York Constitution, Mot. 8-11, 17-18, but plaintiffs, in their opposition, expressly withdrew those claims, ECF No. 51 ("Opp.") at 21, 29, and therefore, we need not address them.

further argue that plaintiffs' claims against Moody are subject to dismissal because Moody is entitled to qualified immunity.  See id. at 12-17.  We will address each of these claims and arguments in turn.

## A. Intimate Association

Plaintiffs claim that by removing K.A. from K.W.'s custody, defendants violated their First Amendment right to intimate association.  FAC ¶¶ 138-50.  The right to intimate or familial association "guarantees an individual the choice of entering into an intimate relationship free from undue intrusion by the state." Sanitation & Recycling Indus. v. City of New York, 107 F.3d 985, 996 (2d Cir. 1997).  "[C]ourts within this Circuit specifically addressing the right to intimate association vis-à-vis parent-child relationships have analyzed the right under the principles of substantive due process rather than the First Amendment." Dabah, 2022 WL 973834, at *4.  While parents have a "constitutionally protected liberty interest in the care, custody, and management of their children," that substantive due process right is "counterbalanced by the compelling and governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves."  Southerland v. City of New York,

680 F.3d 127, 152 (2d Cir. 2012) (quotations omitted).  Thus, in the child-removal context, the substantive due process right to intimate association is not infringed unless the separation of parent and child is "so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection."  Id. (quoting Anthony v. City of New York, 339 F.3d 129, 143 (2d Cir. 2003)).

The City Defendants argue that K.W.'s intimate association claim should be dismissed because it is time-barred by the three-year statute of limitations, which began to run the date on which K.A. was removed from K.W.'s custody.[9]  Mot. at 3-4.  Plaintiffs agree that the statute of limitations is three years, but they argue, inter alia, that it did not begin to run until K.A. was returned to K.W.'s custody, and thus K.W.'s claim is timely.  Opp. at 12-13.  For the following reasons, we reject plaintiffs' position and agree with the City Defendants that K.W.'s intimate association claim is time-barred.

---

[9] Although the intimate association claim was asserted by both plaintiffs, the City Defendants only seek dismissal of K.W.'s claim.  See Mot. at 4 n.1. However, K.A.'s intimate association claim must also be dismissed pursuant to our holdings on qualified immunity and municipal liability, which are fully discussed below.

As an initial matter, "a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." Conn. Gen. Life Ins. Co. v. BioHealth Lab'ys, Inc., 988 F.3d 127, 131-32 (2d Cir. 2021). Plaintiffs assert their intimate association claims pursuant to 42 U.S.C. § 1983,[10] which "does not provide a specific statute of limitations" and thus "courts apply the statute of limitations for personal injury actions under state law." Hogan v. Fischer, 738 F.3d 509, 517 (2d Cir. 2013). "Section 1983 actions filed in New York are therefore subject to a three-year statute of limitations." Id. While state law supplies the statute of limitations for claims under § 1983, "[f]ederal law determines when a section 1983 cause of action accrues." Pearl v. City of Long Beach, 296 F.3d 76, 80 (2d Cir. 2002). Under federal law, claims brought pursuant to § 1983 "accrue[] when the plaintiff knows or has reason to know of the harm." Eagleston v. Guido, 41 F.3d 865, 871 (2d Cir. 1994) (quotations omitted).

In cases involving the allegedly wrongful removal of a parent's child from his custody, courts in this Circuit have repeatedly held that the limitations period accrues, or begins to

---

[10] Under § 1983, governmental actors may be held liable for damages when, acting under color of state law, they deprive a person of "any rights, privileges, or immunities securities by the Constitution." 42 U.S.C. § 1983.

run, "on the date a parent's children were removed." <u>Williams v. Savory</u>, 87 F. Supp. 3d 437, 453 (S.D.N.Y. 2015) (citing cases); <u>see also</u> <u>Skillings v. City of New York</u>, 21 Civ. 3034 (DG)(LB), 2023 WL 8531493, at *9 (E.D.N.Y. Jan. 19, 2023) ("The limitations period begins to accrue on the date of the child's removal." (citing cases)).  Here, K.W.'s claim accrued on March 8, 2017, when K.A. was first removed from K.W.'s custody at the mandatory meeting at ACS's office.  FAC ¶ 65.  Accordingly, plaintiffs were required to commence this action by March 8, 2020, but they did not do so until October 18, 2022, ECF No. 1,[11] more than two and a half years after the expiration of the statute of limitations period.  Therefore, K.W.'s intimate association claim is time-barred and thus subject to dismissal.

Plaintiffs' arguments to the contrary are without merit. First, plaintiffs urge us to disregard the rule, followed by numerous courts in this Circuit, that the limitations period begins from the date of the child's removal, and instead adopt, in this context, the unique accrual rule that is applied in the false

_____

[11] The Clerk of Court deemed plaintiffs' initial complaint deficient, and plaintiffs did not re-file the complaint until November 17, 2022.  ECF No. 3. For purposes of the statute of limitations, "[a] complaint is deemed filed when the Clerk of Court receives it."  <u>Kalican v. Dzurenda</u>, 583 F. App'x 21, 23 (2d Cir. 2014).  Thus, plaintiffs' initial filing error does not void October 18, 2022 as the filing date for statute of limitations purposes.

imprisonment context.  Opp. at 12-13.  In that context, the limitations period only begins once the false imprisonment ends, which is when "the victim becomes held pursuant to legal process." Id. at 13 (quoting Wallace v. Kato, 549 U.S. 384, 389 (2007)). However, as the Supreme Court has explained, this "distinctive rule" is only applied in false imprisonment cases due to the "reality that the victim may not be able to sue while he is still imprisoned."  Wallace, 549 U.S. at 389.  In this context, by contrast, there is no practical impediment to a plaintiff-parent bringing suit from the moment his child is removed from his custody.  Indeed, for reasons discussed more fully below, K.W. could have asserted his intimate association claim at any point after K.A.'s allegedly unlawful removal, but he failed to do so. Therefore, we reject plaintiffs' invitation to import the false imprisonment rule into cases involving the removal of children from a parent's custody.

Second, plaintiffs argue that K.W.'s intimate association claim is timely because there was a "continuing violation" that delayed the running of the limitations period until K.A. was returned to K.W.'s custody.  Opp. at 13.  The so-called continuing violation doctrine, where applicable, provides an "exception to the normal knew-or-should-have-known accrual date."  Gonzalez v.

<u>Hasty</u>, 802 F.3d 212, 220 (2d Cir. 2015) (quoting <u>Harris v. City of</u>
<u>New York</u>, 186 F.3d 243, 248 (2d Cir. 1999)).  Critically, the
doctrine applies only to claims that are "composed of a series of
separate acts that collectively constitute one unlawful []
practice."  <u>Id.</u> (quoting <u>Washington v. Cnty. of Rockland</u>, 373 F.3d
310, 318 (2d Cir. 2004).  However, the doctrine does not apply to
claims that are based on "discrete unlawful acts, even where those
discrete acts are part of a serial violation."  <u>Id.</u> (quotations
and alterations omitted).

Here, plaintiffs' intimate association claim, properly
construed as a substantive due process claim, is not covered by
the continuing violation doctrine.  In this context, a substantive
due process claim only "challenges the 'fact of [the] removal'
itself."[12]  <u>Southerland</u>, 680 F.3d at 142 (quoting <u>Bruker v. City</u>

---

[12] Although the post-removal period of separation plays some role in the
analysis, which might suggest a more gradual harm, the length of time is only
relevant until there is family court "confirmation of the basis for removal,"
<u>Southerland</u>, 670 F.3d at 153, at which point "any removal that occur[s]
following the [family court] hearing is not attributable to Defendants,"
<u>Shweitzer v. Crofton</u>, 935 F. Supp. 2d 527, 550 (E.D.N.Y. 2013). Here, plaintiffs
seem to acknowledge that the Family Court's confirmation hearing took place on
the same day that K.A. was initially removed from K.W.'s custody.  FAC ¶¶ 53-
64.  Thus, if we were to reach the merits of K.W.'s intimate association claim,
it seems that this exceedingly brief period between K.A.'s removal and the
Family Court hearing would prove fatal to his claim.  See <u>Southerland</u>, 680 F.3d
at 154 (no substantive due process violation where post-removal judicial
confirmation proceeding was held within four days after removal); <u>Shweitzer</u>,
935 F. Supp. 2d at 549 (no substantive due process violation where a post-
removal judicial hearing was held within six days, three business days, after
child's removal); <u>E.D. ex rel. V.D. v. Tuffarelli</u>, 692 F. Supp. 2d 347, 368

-21-

of New York, 92 F. Supp. 2d 257, 266-67 (S.D.N.Y. 2000)).  As such,
K.W.'s intimate association claim is predicated on one "discrete
unlawful act[]" -- the initial removal from custody -- rather than
on a "series of separate acts that collectively constitute one
unlawful [] practice," which would warrant application of the
continuing violation doctrine.  Gonzalez, 802 F.3d at 220.  As one
court aptly summarized, in rejecting an argument similar to the
one advanced here, the plaintiff's "loss of custody continued over
time, compounding the pain to [plaintiff] from her children's
absence," but "the acts giving rise to [her] claim were complete
when [the defendants] took her children away.  At that moment,
[plaintiff] knew – or at the every least, should have known -- of
the alleged wrong." Williams, 87 F. Supp. 3d at 454.  Accordingly,
we conclude that the continuing harm doctrine cannot save K.W.'s
intimate association claim from dismissal for being untimely.

B.    **Procedural Due Process**

     The City Defendants next seek dismissal of plaintiffs'
Fourteenth Amendment procedural due process claims on the basis
that K.W.'s claim is time-barred and that both K.W. and K.A.'s

---

(S.D.N.Y. 2010) (no substantive due process violation where child was removed
on a Friday and judicial proceedings commenced on the following Monday).

claims fail to state a claim.[13]  See Mot. at 6-8.  Although a similar timeliness analysis to the one outlined above likely forecloses K.W.'s claim, we will instead focus on the City Defendants' second argument for dismissal, which requires us to assess the merits of both plaintiffs' procedural due process claims.[14]  For the following reasons, we find that these claims fail as a matter of law and therefore must be dismissed.

"[B]oth parents and [their] children may have a cause of action for violation of the Fourteenth Amendment under a theory of denial of procedural due process."  Southerland, 680 F.3d at 142. The Fourteenth Amendment requires that, "except in emergency circumstances, judicial process must be accorded both parent and child before removal of the child from his or her parent's custody may be effected."  Id. (citing cases).  The emergency circumstances exception allows government officials to remove a child from his parents' custody before a hearing is held where "there is an objectively reasonable basis for believing that a threat to the

---

[13] Plaintiffs assert two separate procedural due process claims under the Fourteenth Amendment, FAC ¶¶ 168-75, 225-32, which we will address together.
[14] Plaintiffs argue that the City Defendants have somehow waived their argument that plaintiffs failed to adequately plead procedural due process violations because the City Defendants fail to provide "any case law or facts to support their assertion."  Opp. at 19.  While plaintiffs are correct that this section of the City Defendants' brief is noticeably light on the law, the City Defendants do cite numerous facts justifying and thus preserving their position that plaintiffs' procedural due process claims fail as a matter of law.

child's health or safety is imminent." Gottlieb v. Cnty. of Orange, 84 F.3d 511, 520 (2d Cir. 1996). The Second Circuit "has not attempted to set forth exhaustively the type of factual circumstances that constitute imminent danger justifying emergency removal as a matter of federal constitutional law," but it has "concluded that these circumstances include the peril of sexual abuse, the risk that children will be left bereft of care and supervision, and immediate threats to the safety of the child." Southerland, 680 F.3d at 142 (cleaned up); see also N.Y. Fam. Ct. Act § 1024(a) (defining emergency circumstances, for purposes of state law, as "circumstance[s]" wherein a child's remaining in the parent's care and custody "presents an imminent danger to the child's life or health").

In this case, the City Defendants have demonstrated the sort of emergent circumstances warranting removal without a court order. As an initial matter, K.A. was removed from K.W.'s custody pursuant to New York Family Court Act § 1027, which allows a child to be removed "without court order" so long as a family court hearing is held "no later than the next court day after the filing of a petition." N.Y. Fam. Ct. Act § 1027(a)(1). Here, just hours after removing K.A. from his parents' custody, the City Defendants filed a removal petition with the Family Court, which, on the same

day, convened a preliminary hearing and issued an order authorizing the temporary removal of K.A. from his parents' custody. See Pet. ¶ 1; Removal Order at 1-3. In so doing, the City Defendants clearly complied with the requirements set forth in § 1027.

Furthermore, despite plaintiffs' apparent efforts to conceal the facts on the ground, Family Court filings demonstrate that the City Defendants had more than sufficient cause to remove K.A. from his parents' custody on an emergency basis. Although plaintiffs do briefly acknowledge that "K.A.'s mother had extensive ACS history," FAC ¶ 198, they do not mention the critical details about K.A.'s mother that were included in the removal petition, namely that she had been deemed neglectful of ten different children due to her (1) failure to "plan for her children," (2) untreated mental health diagnosis, (3) cocaine and marijuana usage without participating in a drug treatment program, and (4) failure to comply with past court orders. See Pet., Addendum I ¶ 1. Additionally, there was an expressed concern that K.A.'s mother had not engaged in any of the numerous services to which she was repeatedly referred by ACS and foster care agencies to "address the risk posed to [K.A.'s] siblings." Order at 1. It was for these reasons that the City Defendants concluded in their petition that K.A.'s "physical, mental, or emotional condition has been

-25-

impaired or is in imminent danger of becoming impaired as a result of the failure of [his] mother . . . to exercise a minimum degree of care." Petition, Addendum I at 1. Against this backdrop, we have little trouble concluding that the City Defendants had an "objectively reasonable basis for believing that a threat to [K.A.'s] health or safety [was] imminent," thereby justifying K.A.'s emergency removal.[15] <u>Gottlieb</u>, 84 F.3d at 520.

Our conclusion is unaltered by plaintiffs' contention that there was no basis to remove K.A. from K.W.'s custody given the lack of neglect accusations lodged specifically against K.W. <u>See</u> Opp. at 20-21. Despite plaintiffs' apparent attempt to downplay this critical fact, the Family Court records, coupled with some tea leaves from the complaint, reveal that there were legitimate questions about K.W.'s paternity when K.A. was first removed from K.W.'s custody. Indeed, the Family Court petition noticeably states that K.W. "is or <u>is alleged to be</u>" K.A.'s father, Pet. ¶ 4 (emphasis added), the uncertainty of which explains why K.W. was required to prove his paternity in the months following K.A.'s

---

[15] Plaintiffs argue that any inference of emergent circumstances is undercut by the fact that defendants conducted a welfare check but "permitted [K.W.] to keep [K.A.] overnight in [K.W.'s] home before they removed [K.A.] from his care" the following day. Opp. at 18. This contention is meritless. In rejecting an identical argument, the court in <u>Williams</u> persuasively reasoned that "the fact that ACS conscientiously and quickly followed up . . . is a sign of care rather than a sign that the circumstances were not extremely serious." <u>Williams</u>, 87 F. Supp. 3d at 459.

removal, FAC ¶ 69. Additionally, Family Court documents reflect that, at least at the time of removal, K.W. resided in the same apartment as K.A.'s mother, who had been repeatedly adjudicated neglectful of her children and failed to engage in any of the numerous services to which she was referred. See Pet. ¶ 4. It was thus entirely sensible that defendants told K.W. from the outset that "his home was too small for him to live with [K.A.]."[16] FAC ¶ 51. In sum, in addition to questions about K.W.'s paternity, the City Defendants had well-founded concerns that K.W. would not be able to keep K.A. physically distanced from his mother, who was reasonably considered to be the source of imminent harm to K.A. Accordingly, K.A.'s removal from K.W.'s custody was entirely justified and does not amount to a procedural due process violation.[17]

---

[16] Based on what can be gleaned from the complaint and Family Court documents, K.W. eventually moved out of the apartment with K.A.'s mother and into another residence with his own mother. FAC ¶¶ 91-93. However, the procedural due process analysis turns on whether there were emergent circumstances justifying the initial removal, which there certainly were, and not on the ongoing separation following judicial confirmation of the removal. See Southerland, 680 F.3d at 142. Even if the subsequent separation were relevant, as discussed below, K.W.'s living with his own mother raised additional concerns for K.A.'s wellbeing that further justified his ongoing separation.

[17] Plaintiffs also contend that their procedural due process claims were well-pleaded by citing two allegations in their complaint, namely that (1) "the Fourteenth Amendment imposes a requirement that judicial process must be afforded both parent and child before removal of the child from his or her parent's custody may be effected," and (2) "[d]efendants took [K.A.] . . . without any due process . . . without any emergency . . . [and] without any hearing." Opp. at 20 (quoting FAC ¶¶ 34-36, 228). However, these allegations are not only entirely unsupported, but they are also quintessential "[t]hreadbare recitals of the elements of a cause of action" and "conclusory

## C.    False Arrest

We now turn to K.A.'s federal false arrest claim, asserted only against Moody, and agree with the City Defendants that this claim should be dismissed for failure to state a claim.  See Mot. at 4-6.  We begin first by reframing, albeit slightly, K.A.'s false arrest claim against Moody.  After a review of comparable cases, false arrest claims in this context are generally asserted by the parent, rather than the child, after the parent is arrested for apparent abuse or neglect of his child.  See, e.g., Williams, 87 F. Supp. 3d at 461; Cook v. City of New York, 243 F. Supp. 3d 332, 342-44 (E.D.N.Y. 2017); Richards v. City of New York, 97 Civ. 7990 (MBM), 2003 WL 21036365, at *9 (S.D.N.Y. May 7, 2003); Thomas v. Culberg, 741 F. Supp. 77, 79-80 (S.D.N.Y. 1990).  But where, as here, the child "is taken into state custody, his [] person is 'seized' for Fourth Amendment purposes" and therefore, the child, rather than asserting a false arrest claim, may "assert a claim under the Fourth Amendment that the seizure of his [] person was 'unreasonable.'"  Southerland, 680 F.3d at 143 (quoting U.S. Const. amend. IV).  Indeed, "[t]he removal of a child, even on a temporary basis, may constitute a 'seizure' for the purpose of the Fourth

statements" that we must set aside when assessing the sufficiency of a complaint, and therefore, they are insufficient to sustain plaintiffs' procedural due process claims.  Iqbal, 556 U.S. at 678.

Amendment's prohibition against unlawful search and seizure."
E.D. ex rel. V.D. v. Tuffarelli, 692 F. Supp. 2d 347, 366 (S.D.N.Y.
2010) (citing Tenenbaum v. Williams, 193 F.3d 581, 602 (2d Cir.
1999)).  Although a Fourth Amendment child-seizure claim "belongs
only to the child, not to the parent, [the] parent has standing to
assert it on the child's behalf."  Southerland, 680 F.3d at 143.
Accordingly, we construe K.A.'s false arrest claim as a Fourth
Amendment unlawful-seizure claim.[18]

As a general matter, "[t]o establish that a seizure violated
the Fourth Amendment, a plaintiff must show that the seizure was
unreasonable -- i.e., that it was not supported by probable cause."
Smith v. Tkach, 844 F. App'x 414, 416 (2d Cir. 2021) (citing
Tenenbaum, 193 F.3d at 602).  However, as more fully explained
below, the probable cause analysis takes on a different shape
depending on whether a "neutral magistrate," such as a family court
judge, has entered an order authorizing the seizure in question.
See id.  Thus, to properly assess this newly framed claim, we must
essentially separate it into two distinct components: (1) K.A.'s

---

[18] Plaintiffs themselves seem to conflate these two distinct claims.  At the end
of the section in their opposition brief in which they address K.A.'s false
arrest claim, plaintiffs rely on Southerland's discussion of unlawful seizure
under the Fourth Amendment.  Ultimately, the daylight between these claims is
largely irrelevant given that both claims find their origin in the Fourth
Amendment and largely turn on the existence of probable cause.

allegedly unlawful seizure that occurred for several hours <u>before</u> the Family Court entered an order on March 8, 2017, directing the temporary removal of K.A.; and (2) the yearslong separation from K.W. that occurred after the issuance of that order.  FAC ¶ 64. We will begin with the alleged pre-order seizure before analyzing the purported post-order seizure.

## 1. Pre-Order Seizure

By way of reminder, as alleged, K.A. was removed from K.W.'s custody during the mandatory meeting at ACS's offices on March 8, 2017, hours before the Family Court issued an order authorizing K.A.'s removal later that same day.  FAC ¶¶ 29-64.  Although the period between removal and judicial authorization was brief, plaintiffs contend that "[t]hose hours of detention must [] be considered unlawful."  Opp. at 18.  However, for the following reasons, plaintiffs' argument lacks merit.

The Second Circuit "has yet to articulate definitively the legal standard that applies to a Fourth Amendment unlawful seizure claim brought by a child alleging that his or her removal without parental consent or prior judicial authorization was not supported

by sufficient cause."[19] <u>Southerland</u>, 680 F.3d at 157. Nonetheless, it is well established that, at minimum, where information possessed by a caseworker would "warrant a person of reasonable caution in the belief that a child is subject to the danger of abuse if not removed from [his home] before court authorization can reasonably be obtained, the 'exigent circumstances' doctrine . . . permits removal of the child without a warrant equivalent and without parental consent."[20] <u>Id.</u> at 158 (quoting <u>Tenenbaum</u>, 193 F.3d at 605); <u>see also</u> <u>Schweitzer v. Crofton</u>, 935 F. Supp. 2d 527, 551 (E.D.N.Y. 2013) (noting that the Second Circuit has not definitively embraced a standard and relying on exigent circumstances doctrine).

---

[19] The Court has considered three possible standards in determining whether such a removal was permissible: (1) the "exigent-circumstances" standard for warrant searches, which "would apply when 'a child is subject to the danger of abuse if not removed . . . before court authorization can reasonably be obtained,'" <u>Southerland</u>, 680 F.3d at 158 (quoting <u>Tenenbaum</u>, 193 F.3d at 605); (2) the traditional probable cause standard applicable in the law enforcement context, whereby "a caseworker could lawfully remove a child from his or her home without parental consent or prior judicial authorization if the caseworker knew 'facts and circumstances that were sufficient to warrant a person of reasonable caution in the belief that' a child was abused or neglected," <u>id.</u> (quoting <u>Tenenbaum</u>, 193 F.3d at 602-03); and (3) the less stringent "special needs" standard that would require only "reasonable cause," <u>id.</u> The district court in <u>Southerland</u>, on remand, observed that in the context of child removals, the exigent circumstances and probable cause standards are "functionally the same" because "[i]f exigent circumstances exist to justify seizure of a child from the home, then probable cause for the seizure is also present," and vice versa. <u>Southerland v. Woo</u>, 44 F. Supp. 3d 264, 276 (E.D.N.Y. 2014), <u>aff'd</u> 661 F. App'x 94 (2d Cir. 2016).
[20] "In child abuse investigations, a Family Court order is equivalent to a search warrant for Fourth Amendment purposes." <u>Southerland</u>, 680 F.3d at 144 n.16.

As may be apparent, the exigent circumstances standard
employed here, in the Fourth Amendment context, bears a striking
resemblance to the emergency circumstances exception used to
assess plaintiffs' procedural due process claims.  Indeed, "the
existence of emergency circumstances sufficient to justify removal
of [children] in a manner comporting with their due process rights
[] also certainly suffice[s] to justify their removal in a manner
comporting with their Fourth Amendment rights barring unreasonable
seizure."  Southerland, 680 F.3d at 161.  As one court explained,
"[w]hatever Fourth Amendment analysis is employed," in the child-
removal context, "it results in a test for present purposes similar
to the procedural due-process standard."  Tuffarelli, 692 F. Supp.
2d at 366-67 (quoting Tenenbaum, 193 F.3d at 605).  Because the
City Defendants have established that emergent circumstances
justified K.A.'s removal for purposes of procedural due process,
it necessarily follows that they have also demonstrated exigent
circumstances warranting removal under the Fourth Amendment.
Therefore, we dismiss K.A.'s unlawful seizure claim to the extent
it arises out of his removal before the entry of the Family Court's
order.  However, our Fourth Amendment analysis does not end there.

## 2. Post-Order Seizure

As mentioned above, a significant portion of K.A.'s unlawful seizure claim is premised on his yearslong separation from K.W. that occurred <u>after</u> the issuance of a Family Court order remanding K.A. to the temporary custody of ACS.  FAC ¶ 64; Opp. at 16-18. The entry of that order is significant because it gives rise to a "presumption of probable cause" that "places upon the plaintiff the burden of pleading facts sufficient to overcome it." <u>Johnson v. City of New York</u>, 20 Civ. 3038 (GBD)(BCM), 2022 WL 4364879, at *4 (S.D.N.Y. Sept. 21, 2022) (citing cases); <u>see also</u> <u>V.A. v. City of New York</u>, 22 Civ. 773 (LJL), 2023 WL 6254790, at *8 (S.D.N.Y. Sept. 26, 2023) (finding family court order directing the temporary removal of an infant "establishes a presumption of probable cause").  That presumption of probable cause "is rebuttable, and may be overcome by evidence establishing that the [] witnesses have not made a complete and full statement of facts, that they have misrepresented or falsified evidence, or otherwise acted in bad faith." <u>Boyd v. City of New York</u>, 336 F.3d 72, 76 (2d Cir. 2003) (cleaned up).  In the context of child abuse or neglect proceedings, the presumption may be rebutted where the petition for removal "was either intentionally or recklessly false."

Johnson, 2022 WL 4364879, at *4 (quoting Estiverne v. Esernio-Jenssen, 833 F. Supp. 2d 356, 379 (E.D.N.Y. 2011)).

Here, plaintiffs do not even attempt to argue that any information provided in the City Defendant's petition to the Family Court was false -- intentionally or otherwise.  This, on its own, is sufficient to dismiss K.A.'s unlawful seizure claim in full. However, for the avoidance of doubt, we will briefly address plaintiffs' unpersuasive attempts to rebut the presumption of probable cause created by the Family Court's order of protection. Plaintiffs' chief rebuttable argument is that K.A.'s mother was the sole subject of the City Defendants' neglect petition, and that the Family Court's order provided no basis to remove K.A. from K.W.'s custody.  Opp. at 17.  However, as discussed above, the City Defendants had doubts about K.W.'s paternity, as well as legitimate concerns that K.W. could not keep K.A. physically separated from K.A.'s mother, who had an extensive history of child neglect and shared an apartment with K.W. at the time of K.A.'s removal.  Again, plaintiffs do not suggest that either of these concerns were false or illegitimate, and K.W.'s subsequent conduct only corroborated these fears.  For example, as the City Defendants later found, K.W. exercised "poor judgment" by allowing K.A.'s

mother to be present during his unsupervised visits with K.A., in direct violation of Family Court orders. ECF No. 61-17 at 3.

To the extent plaintiffs attempt to rebut the presumption of probable cause by relying on K.A.'s subsequent yearslong separation, which was repeatedly authorized by the Family Court to ensure K.A.'s safety and well-being, such reliance is misplaced. The City Defendants consistently found, and the Family Court apparently agreed, that K.W. had serious hurdles to clear before he could be safely reunited with his son. As discussed above, over the yearslong period of separation, K.W. (1) did not have "adequate housing," ECF No. 61-17 at 2-3; (2) tested positive for marijuana on numerous occasions, see id. at 2; and (3) demonstrated an inability to parent given that K.A. often returned from unsupervised visits with K.W. "with a wet diaper" and, at least on one occasion, with clothes that were "soaked with urine," ECF No. 61-3 at 3. These findings led the City Defendants to recommend that K.W. "complete a parenting class specific to parents of toddlers prior to reunification." ECF No. 61-17 at 5-6. Plaintiffs do not even attempt to cast doubt on any of these legitimate reasons justifying K.A.'s ongoing separation from K.W., and because plaintiffs fail to rebut the presumption of probable

cause raised by the Family Court's removal order, K.A.'s Fourth Amendment claim is dismissed.

## D.   NYCHRL Discrimination

Next, we address plaintiffs' claims that they were discriminated against on the basis of their gender and race, in violation of the NYCHRL.  The City Defendants contend that these claims should be dismissed because plaintiffs fail to advance the factual allegations necessary to establish such discrimination. See Mot. at 11-12.  We agree with the City Defendants and dismiss plaintiffs' NYCHRL claims.

In New York City, it is an unlawful discriminatory practice for any "provider of public accommodation" to "refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, . . . services, facilities or privileges of the place or provider of public accommodation" because of "any person's actual or perceived race [or] gender."[21]   NYCHRL § 8-107(4).  The NYCHRL requires us to construe the statute "more liberally" than its state and federal counterparts, Makinen v. City of New York, 857 F.3d 491, 495 (2d

_____

[21] The City Defendants seem not to dispute that ACS is a provider of public accommodation subject to the requirements of NYCHRL.

-36-

Cir. 2017), and its requirements "broadly in favor of discrimination," Mihalik v. Credit Agricole Cheuvreux N.A., Inc., 715 F.3d 102, 109 (2d Cir. 2013). To establish a gender or race discrimination claim under the NYCHRL, a plaintiff "need only show differential treatment -- that [he] is treated 'less well' -- because of a discriminatory intent." Id. at 110. Despite this comparatively relaxed standard, "[t]he plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive," id., and based on the allegations in the complaint, we conclude that plaintiffs have not carried their burden of establishing such intent.

Upon a careful review of the operative complaint, it is clear that the relevant factual allegations are too general and conclusory to state a claim under the NYCHRL. Beginning with plaintiffs' gender-discrimination claims, the First Amended Complaint generally alleges that "[d]efendants regularly permit mothers to retain custody of their children when they are non-respondents" in Family Court proceedings and that K.W. "was treated less well than K.A.'s mother." FAC ¶¶ 194, 199. However, plaintiffs do not detail any specific instances of defendants treating fathers less favorably than mothers in child removal proceedings, nor do plaintiffs explain with any semblance of

specificity how K.W. was treated less favorably than K.A.'s mother.[22] "Absent concrete details, these conclusory allegations fall short of stating an NYCHRL claim for [gender] discrimination." Nezaj v. PS450 Bar & Restaurant, 22 Civ. 8494 (PAE), 2024 WL 815996, at *10 (S.D.N.Y. Feb. 27, 2024) (citing cases).

Plaintiffs' allegations of race discrimination suffer from the same fatal defect. Indeed, for this claim, plaintiffs effectively copy and paste the same generic allegations used for their gender discrimination claims but replace "male" and "father" with "Black." For example, mirroring their gender discrimination allegations, plaintiffs allege that "[d]efendants regularly permit non-Black parents to retain custody of their children when they are non-respondents" and that K.W. was "treated less well than non-Black parents." Id. ¶¶ 217, 219. Here, too, plaintiffs provide no further factual allegations to support these sweeping assertions of discrimination.[23] Thus, plaintiffs' NYCHRL claims for both gender and racial discrimination fail for the same reason:

---

[22] In their opposition brief, plaintiffs cite a 1996 Second Circuit decision as a "relevant example of how a non-respondent mother was permitted to keep her children despite ACS' issues with her husband." Opp. at 22 (citing Gottlieb, 84 F.3d at 522). However, a single example stemming from events that occurred in 1990 -- nearly thirty years before the events at issue here -- is not remotely sufficient to demonstrate that K.W. was treated differently due to his gender.
[23] Plaintiffs' arguments in their opposition brief only underscore the lack of concrete allegations of discrimination in their complaint. For example, plaintiffs claim, without any evidence, that the "same racist and sexist troupes [sic] of the absent 'black father' must have played a role in [d]efendants' decision to keep [K.A.] away from [K.W.]." Opp. at 23.

the underlying allegations are simply too general and conclusory to support a plausible inference that defendants acted with any discriminatory motive.[24]  See Nezaj, 2024 WL 815996, at *10.  As such, plaintiffs' NYCHRL claims are dismissed.

## E.    Federal Discrimination

In addition to their NYCHRL discrimination claims, plaintiffs assert claims under § 1983 against the City for racial discrimination in violation of the Fourteenth Amendment.  The City Defendants seek dismissal of these claims on the ground that they are untimely.  Mot. at 17-18.  Although we agree with the City Defendants and thus need not reach the merits, plaintiffs' federal discrimination claims can also be dismissed on the merits for several independent reasons.

A municipality may be held liable under § 1983 only where "a violation of rights resulted from the 'government's policy or

---

[24] We note that plaintiffs cite various statements made in a 2020 internal audit commissioned by ACS and elsewhere that discuss the disparate treatment of Black parents and children in the child welfare system.  See FAC ¶¶ 127-33.  These statements, however, do not change the simple but dispositive conclusion that plaintiffs make no specific factual allegations that support an inference that their race (or gender) was a motivating factor in defendants' conduct.  See Bledsoe v. Delta Air Lines, Inc., 23 Civ. 3146 (HG)(JAM), 2024 WL 1142321, at *3 (E.D.N.Y. Mar. 15, 2024) (dismissing NYCHRL claim where plaintiff made only "non-specific assertion[s]" to support the alleged discrimination); Cruz v. SEIU Local 32BJ, 19 Civ. 11836 (LS), 2021 WL 3604661, at *5 (S.D.N.Y. Aug. 12, 2021) ("NYCHRL claims . . . require specific allegations that discrimination on the basis of race [or] gender . . . play[ed] a role in the defendant's conduct." (citing cases)).

-39-

custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" Nagle v. Marron, 663 F.3d 100, 116 (2d Cir. 2011) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)).  In the Second Circuit, to establish Monell liability, a plaintiff must show: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." Torraco v. Port Auth. of N.Y. & N.J., 615 F.3d 129, 140 (2d Cir. 2010).

Critically, "in the absence of an underlying constitutional violation by a [municipal] employee there is no municipal liability under Monell." Fappiano v. City of New York, 640 F. App'x 115, 121 (2d Cir. 2016); see also Green v. City of Mt. Vernon, 22 Civ. 8554 (CS), 2024 WL 710191, at *2 (S.D.N.Y. Feb. 21, 2024) (citing cases).  Here, plaintiffs' Monell claim is premised on allegations that they were discriminated against on the basis of their race. However, because plaintiffs failed to establish such discrimination under NYCHRL, it follows that they cannot establish discrimination under the more stringent federal standard.  See Lott v. Coreone Techs., LLC, 14 Civ. 5848 (CM), 2016 WL 462486, at *14 (S.D.N.Y. Feb. 2, 2016) ("If [plaintiff] fails to make out a claim [] under the NYCHRL, he necessarily fails under the more stringent state and federal claims."); see also Lebowitz v. N.Y.C.

Dep't of Educ., 407 F. Supp. 3d 158, 173 (E.D.N.Y. 2017) ("The pleading standard for a discrimination claim under the NYCHRL is far more liberal than for federal and state discrimination claims."). Accordingly, because plaintiffs have not established an underlying constitutional violation, they necessarily cannot sustain a Monell claim.

Even if plaintiffs had adequately pleaded an underlying violation, they have fallen far short of demonstrating any municipal custom or policy that led to their alleged discrimination, as is required under Monell. Rather, plaintiffs merely allege that City "has implemented and enforced practice and/or custom of improperly removing children from their parents . . . based on race rather than risk of harm to the child." FAC ¶ 158. Beyond this boilerplate language, plaintiffs provide no factual allegations to support the assertion that the City has adopted the type of discriminatory policy that plaintiffs claim it has. Thus, for this additional reason, plaintiffs' Fourteenth Amendment discrimination claim against the City is legally deficient and must be dismissed. See Allen v. Antal, 665 F. App'x 9, 14 (2d Cir. 2016) (affirming dismissal of Monell claim where the "existence of an official municipal policy or custom" was alleged in a "conclusory manner"); Gordon v. City of N.Y., 10 Civ.

5148 (CBA)(LB), 2012 WL 1068023, at *4 (E.D.N.Y. Mar. 29, 2012)
(dismissing Monell claim because the complaint was "devoid of
factual support for his references to a municipal policy"); Perez
v. Cnty. of Westchester, 83 F. Supp. 2d 435, 438 (S.D.N.Y. 2000)
(dismissing Monell claim because "[t]he complaint does not include
any facts demonstrating the existence of a policy or custom").

## F.  Qualified Immunity[25]

    Plaintiffs' § 1983 claims brought against Moody -- namely,
the intimate association (or substantive due process), procedural
due process, and false arrest (or unlawful seizure) claims -- each
fail for the independent reason that Moody is entitled to qualified
immunity.[26]  "ACS caseworkers and their superiors are generally
entitled to qualified immunity from claims under Section 1983 if
it was objectively reasonable for the caseworkers to believe their
conduct did not violate clearly established statutory or
constitutional rights of which a reasonable caseworker would have

---

[25] In addition to qualified immunity, the City Defendants initially argued that
Moody is protected by New York Social Services Law § 419, Mot. at 15-17, which
"provides immunity from liability under New York state law for child protective
services institutions and their staffs under specified circumstances," Callwood
v. Meyer, No. 20-2019, 2022 WL 1642558, at *3 (2d Cir. May 24, 2022).  However,
the immunity afforded by § 419 "applies only to state law claims, and not to []
federal claims."  Cornigans v. Mark Country Day Sch., Civ. 03-1414 (DLI)(WDW),
2006 WL 3950335, at *9 (E.D.N.Y. July 12, 2006).  Because plaintiffs have
withdrawn their state law claims, we need not address immunity under § 419.
[26] Dismissal on this basis is appropriate at this stage because "assertions of
qualified immunity should be addressed as early as possible in the judicial
process."  Savino v. City of New York, 331 F.3d 63, 71 (2d Cir. 2003).

known." <u>V.S. v. Muhammad</u>, 595 F.3d 426, 430-31 (2d Cir. 2010).

"If caseworkers of reasonable competence could disagree on the legality of . . . defendant[s'] actions their behavior is protected." <u>Id.</u> at 431 (quoting <u>Tenenbaum</u>, 193 F.3d at 605). Under this standard, qualified immunity shields from liability caseworkers "tasked with choosing between interrupting parental custody or risking injury to the child "provided that there is an objectively reasonable basis for their decision, <u>whichever way they make it</u>." <u>Doe ex rel. Doe v. Whelan</u>, 732 F.3d 151, 155 (2d Cir. 2013) (quoting <u>Tenenbaum</u>, 193 F.3d at 596) (emphasis in original).

Here, the allegations contained in the operative complaint, coupled with the relevant Family Court records, demonstrate that it was entirely reasonable for Moody to remove K.A. from K.W.'s custody. After conducting an investigation, which included an in-person welfare check, Moody concluded that emergency removal of K.A. was appropriate given that: (1) K.A.'s mother had been neglectful of ten different children prior to K.A.; (2) K.W. shared an apartment with K.A.'s mother at the time of removal; and (3) there were questions about K.W.'s paternity. Notably, plaintiffs do not allege that these facts were untrue or that Moody in any

way attempted to mislead the Family Court in seeking K.A.'s initial removal.

Moreover, Moody's decision to advocate for continued separation was also justified, in light of the facts that: (1) K.W. eventually lived in a one-bedroom apartment with his own mother whose parental rights had previously been terminated; (2) K.W. had allowed K.A.'s mother to attend his unsupervised visits, in violation of Family Court orders; and (3) those visits raised other legitimate concerns about K.W.'s parenting abilities, causing the City Defendants to recommend that K.W. attend additional parenting classes. Again, not only was the ongoing separation repeatedly authorized by the Family Court, but also there is no suggestion by plaintiffs that Moody provided the Family Court with false information in order to cause K.W.'s ongoing separation from K.A. Given these circumstances, it was "objectively reasonable," within the meaning of the law of qualified immunity, for Moody to believe there were both immediate threats to K.A.'s safety, warranting his initial emergency removal, and ongoing threats, justifying his continued separation. Therefore, Moody is entitled to qualified immunity, and, on this basis, all of plaintiffs' claims asserted again him are dismissed,

including K.A.'s intimate association claim, which the City Defendants did not separately move to dismiss.

## G.    Municipal Liability

Just as there is an independent ground to dismiss plaintiffs' § 1983 claims asserted against Moody, there is also an independent ground to dismiss such claims asserted against the City.  As discussed above, "to hold a municipality liable under § 1983 for unconstitutional actions of its employees, a plaintiff must [allege] that there was a municipal policy or custom that directly subjected [him] to a constitutional violation." Kurtz v. Hansell, 20 Civ. 3401 (PAE), 2021 WL 1143619, at *18 (S.D.N.Y. Mar. 24, 2021).  While we have already dismissed plaintiffs' Fourteenth Amendment discrimination claims because plaintiffs made only conclusory references to a policy or custom, the same deficiency dooms plaintiffs' other federal claims against the City, namely the intimate association and procedural due process claims. Indeed, plaintiffs assert that their constitutional rights to intimate association and procedural due process were violated pursuant to a City "policy, pattern, practice or custom," but provide no additional facts to support that contention.  FAC ¶¶ 148 (intimate association), 173 (procedural due process).  In light of the principles outlined above, these generalized allegations are

wholly insufficient to establish municipal liability under <u>Monell</u> and, for this additional reason, plaintiffs' § 1983 claims against the City must be dismissed.  This includes the dismissal of K.A.'s intimate association claim against the City even though the City Defendants did not separately move to dismiss that claim.

## CONCLUSION

For the foregoing reasons, all the claims against the City Defendants are dismissed.  Therefore, the only remaining claims are those asserted against the Non-Profit Defendants who elected to answer the complaint rather than move for dismissal.[27]  With that said, the question arises as to whether plaintiffs' claims against the Non-Profit Defendants are sustainable in light of this decision.  In that regard, we note that plaintiffs' complaint almost exclusively lumps the Non-Profit Defendants together with the City Defendants.  With only a few minor exceptions, there are no allegations made specifically against the Non-Profit Defendants.  Moreover, there is no indication that any decision of the Family Court was influenced by false or misleading information that they provided.  Accordingly, unless plaintiffs can show cause

---

[27] As noted above, plaintiffs have withdrawn their New York constitutional claims, and therefore those are dismissed as against all defendants, including the Non-Profit Defendants.

as to why their claims against the Non-Profit Defendants should
not be dismissed within 30 days, the Court will dismiss those
claims consistent with this decision.  The Clerk of Court is
respectfully directed to terminate the motions pending at ECF No.
46 and 62.


**SO ORDERED.**

Dated:    July 23, 2024
          New York, New York

                                    _____
                                      NAOMI REICE BUCHWALD
                                    UNITED STATES DISTRICT JUDGE